Shear v. Gabovitch.

GERTRUDE SHEAR vs. WILLIAM GABOVITCH
& another,[1] trustees.[2]

No. 94-P-152.

Suffolk. October 14, 1994. - October 14, 1997.

Present: ARMSTRONG, KASS, & JACOBS, JJ.[*]

*Practice, Civil,* Findings by judge. *Fiduciary. Trust,* Removal of trustee,
Breach of trust.

At the trial of an action seeking the removal of trustees and to surcharge them
for alleged losses caused by their alleged breaches of fiduciary duties, the
judge erred in concluding that the plaintiff's husband was not her agent
with respect to her dealings with the trustees of the trust, of which the
plaintiff was a beneficiary, where the plaintiff's instructions to the trustees
established apparent and ostensible authority in her husband to act for her
in communicating with the trustees, and where the trustees' reliance on the
instructions was reasonable; as a consequence, the judge also erred in
excluding from evidence as irrelevant the husband's activities vis-à-vis the
trustees. [668-674]

At the trial of an action seeking the removal of trustees, the judge erred in rul-
ing that trustees of several trusts had a duty to press the closely-held fam-
ily corporation, which had a no-profit, no-dividend policy and the stock of
which funded the trusts, to declare dividends, and in ruling that the trustees
had a duty to initiate litigation to terminate the corporation's profit distribu-
tion method, of which the plaintiff and her family were beneficiaries.
[674-676]

In a civil action in which a trust beneficiary sought to surcharge trustees for
alleged losses caused by their alleged breaches of fiduciary duties, the
judge erred in failing to take account of the encumbered marketability of
minority shareholders' stock in a close family corporation, which comprised
the trust assets, in determining the fair value of the stock, and there was no
basis in the record for the judge's finding that the trustees were in breach
of their duty, or for surcharging the trustees, for their having sold those
shares at a discounted price. [676-679]

*This case was heard by a panel comprising Justices Armstrong, Kass, and
Fine. After the retirement of Justice Fine, Justice Jacobs was added to the
panel. The parties declined reargument, but appeared for a postargument
conference, see note 33, infra.

[1]Sumner Woodrow.

[2]Gertrude Shear and Maurice Shear were named as defendants in a
counterclaim filed by the defendants. The judge dismissed the counterclaim as
unsupported by the evidence.

In a civil action, there was no basis for the judge to have found that trustees, who held as trust assets stock in a closely-held family corporation, wilfully failed to exercise good faith with respect to corporate distributions to the trust beneficiaries or with respect to the sale of minority shareholders' stock. [679-684]

In a civil action, the judge correctly disallowed a trustee's fiduciary fees, on the basis that the trustee had improperly calculated the fees, had not earned the fees claimed, and had otherwise been amply compensated for the services provided. [684-688]

In a civil action brought by a trust beneficiary seeking removal of the trustees, who held as trust assets the stock in a closely-held family corporation, the judge correctly removed the trustees, where the record demonstrated a relationship of hostility between the beneficiaries and the trustees that threatened to interfere with the administration of the trust. [688-689]

This court, having considered the record of an action adjudicating claims of a trust beneficiary challenging the trustees' payment of litigation costs and related fees in the beneficiary's action seeking the trustees' removal, ordered that the total of such expenses be allocated in proportion to the issues on which the respective parties had prevailed on appeal, and that, as to any amounts not already charged to the trusts, the trustees should bear the costs. [689-691]

CIVIL ACTION commenced in the Superior Court Department on March 19, 1987.

The case was heard by *James D. McDaniel, Jr.,* J.

*William Gabovitch* pro se.

*Brian A. Davis* for the plaintiff.

ARMSTRONG, J. The defendants William Gabovitch and Sumner Woodrow were trustees of two Shear family trusts from 1974 to 1992, when they were removed by a judge of the Superior Court. Both defendants appealed, but Woodrow withdrew his appeal. The case is before us on the appeal of Gabovitch.

The plaintiff, Gertrude "Trudi" Shear (Trudi), was the life beneficiary of the two trusts, which had been established by her husband, Maurice "Murray" Shear (Murray), in 1971 and 1973. The trusts were irrevocable. Murray designated himself as the original trustee of both trusts, and he funded the trusts with shares of stock representing his one-third interest in Mount Pleasant Hospital of Lynn (MPH or the hospital) and, later, the Shears' family home. In 1974 he resigned as trustee and asked his accountant, Gabovitch, and his personal attorney, Woodrow, to serve as cotrustees. They agreed and were duly appointed by Trudi, the "then beneficiary," in accordance with the trust instruments' provisions for appointment of successor trustees. In 1986, in circumstances that will be described in detail below,

the trustees sold the trusts' shares of hospital stock back to the hospital for $3 million. Shortly after the sale, Trudi and Murray asked the trustees to resign, in order that Trudi might appoint another trustee or trustees, but both Gabovitch and Woodrow refused. Trudi filed this complaint seeking to remove them and to surcharge them for losses caused by alleged breaches of their fiduciary duty. The trustees filed a counterclaim accusing Trudi and Murray of conspiracy and abuse of process.

After a lengthy trial, the judge in 1992 entered findings that were largely favorable to the plaintiff. He found that the trustees had been guilty of breaches of fiduciary duty: first, for failing to take action to stop a massive waste of hospital assets during the years 1981-1986, resulting in the trusts earning no income from their dominant investment; and, second, for selling the Shear trusts' hospital shares for less than fair value. He found that their actions and omissions were tainted by bad faith, depriving them of the protection of the trusts' identical exculpation clauses. For lost income, the surcharge was $995,825; for the inadequate sale price, $664,880. In addition he surcharged the trustees for all but $7,200 of the fees they had paid themselves, or $285,975,[3] as well as for legal and related fees that they had paid from the trusts in their defense, or $418,759. The total of the surcharges was $2,340,439, for which they were liable jointly and severally, with an additional surcharge of $25,000 against Woodrow alone. Last, the judge ordered the trustees removed and appointed interim successor trustees. The trustees' counterclaim was dismissed.

The plaintiff, in her brief on appeal, makes the point that most of the defendant Gabovitch's argument is directed at facts found by the judge; further, such findings cannot be reversed unless clearly erroneous. That is true, of course, and in a record as long as the 5,000-page example before us, we should be surprised not to find some item that could be said to support almost any one of the judge's findings of fact. The burden is on the appellant to show that a finding of fact is clearly erroneous. *First Pa. Mort. Trust* v. *Dorchester Sav. Bank*, 395 Mass. 614, 621-622 (1985). Despite these hurdles, a finding of fact will be

---

[3]Of the $285,975, $260,975 represented trustee fees in excess of the $7,200 the judge allowed. The remaining $25,000 was for a legal fee paid to Woodrow for work he did in connection with the sale of the shares; this portion of the surcharge was assessed to Woodrow alone.

deemed "clearly erroneous [if], although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Demoulas* v. *Demoulas Super Markets, Inc.*, 424 Mass. 501, 509 (1997), quoting from *United States* v. *United States Gypsum Co.*, 333 U.S. 364, 395 (1948), and *Building Inspector of Lancaster* v. *Sanderson*, 372 Mass. 157, 160 (1977). On careful study of the entire record, including 1,400 pages in documentary form, we *are* left with a definite and firm conviction that certain of the judge's central findings and conclusions are clearly erroneous. As a result of our analysis of the record, we vacate the surcharges relating to lost income and sale of the hospital shares for an inadequate price. We modify the surcharge relating to counsel fees, affirm the surcharge relating to trustee fees, and, despite concluding that the evidence is inadequate to support the findings of breach of fiduciary duty, affirm on the basis of hostility the portion of the judgment removing Gabovitch and Woodrow as trustees. On the basis of findings that *are* supported by the evidence, we affirm the separate judgment dismissing the trustees' counterclaim.

To explain our decision, we have found it necessary to lay out facts, and the evidence relevant to certain findings, in somewhat more detail than is usually called for; part of the reason for this necessity lies in the fact that much evidence that was critical to understanding relationships between the parties and to explain the trustees' actions and omissions claimed as grounds for relief was, in our view, erroneously excluded from evidence on the objections of the Shears. Much of that evidence was documentary and is in the record before us, or was laid out by offers of proof, and we have thought it proper to take it into account in evaluating the trustees' actions in context, to determine whether the plaintiff has sufficiently made out a case of breach of fiduciary duty by the trustees on the whole record. See *Gulf Oil Corp.* v. *Fall River Hous. Authy.*, 364 Mass. 492, 493 (1974); *Markell* v. *Sidney B. Pfeifer Foundation, Inc.*, 9 Mass. App. Ct. 412, 429-431 (1980); *Kosak* v. *MacKechnie*, 24 Mass. App. Ct. 20, 23 (1987). The evidence of which we speak is consistent with the judge's subsidiary findings and with the evidence that *was* admitted. The excluded evidence is significant in that it puts the trustees' and other participants' actions in an

understandable context. The Shears were not entitled to have the trustees' acts considered in an artificial vacuum, shorn of the context that showed their significance. While it is generally inappropriate to find facts at the appellate level, *Markell, supra* at 430, particularly based on excluded evidence, it *is* appropriate to evaluate the adequacy of the plaintiff's showing of breach of fiduciary duty against the evidence as it would have appeared but for the judge's errors in sustaining the plaintiff's own objections.

With that preface, we set out the facts in three parts: first, a general chronology of events; second, an explanation of the financial operations of MPH, the trusts' dominant investment; and, third, a discussion of one critical conclusion of fact that, in our view, was clearly erroneous.

1. *Chronology of events.* The hospital was established in the late 1960s,[4] in Lynn, by Murray and two partners, Milton Richman and Dr. Walter Henry. MPH was an eighty-eight bed, private, proprietary, non-acute hospital specializing in treatment for alcoholism and substance abuse. Its humane treatment and rehabilitation programs were said to be unusual at the time but had a precursor in Doctors Hospital in Worcester. Murray was involved with Doctors Hospital, apparently in a managerial capacity. Dr. Henry was an osteopathic physician and Richman an attorney. The record does not disclose the equity contributions, if any,[5] of the three partners in the founding of MPH, but each had one-third of the shares of stock, and it was understood from the outset that the three men, with their families, would share equally in the economic benefits of its operation. Each of the three was to serve as an officer of the hospital at times during the ensuing fifteen or twenty years, Murray serving as treasurer until he was removed in 1980.

The hospital prospered from the late 1970s to 1986, but relations among the partners were rarely harmonious. In 1972 Richman and Murray had a falling out with Henry, who had borne primary responsibility for running MPH as chief executive officer from 1966. Henry was removed in 1972, and Richman and Murray assumed joint responsibility for controlling the opera-

---

[4]The hospital was an amalgam of three separate corporations and a realty trust, called in the record "the ancillary companies." They were created at times ranging from 1966 to 1971 and were treated for financial and rate-setting purposes as a single entity.

[5]The value of the hospital was carried on the books as $1,000.

tions of MPH. In 1975 Richman and Murray had a falling out, and Murray and Henry took over joint control of the hospital. The evidence suggested that Henry, although chief executive officer, by that time was spending many months in Florida each year and that Murray, occupying the office of treasurer, had a relatively unfettered hand in controlling the hospital until his removal in 1980.

In the early 1970s each of the three partners put his shares of hospital stock into trusts. Murray created two virtually identical trusts, the first in 1971 and the second in 1973 and, as previously noted, funded them with his shares of hospital stock and, later, title to the Shear family home. Trudi was the beneficiary for life, unless she should sooner cease to be married to Murray or, after his death, should remarry. Thereafter the trusts were to be divided into three parts, one for each son. These trusts would end when the sons, respectively, reached age thirty-five. The trusts were irrevocable, and distributions were discretionary with the trustee or trustees.[6] The latter were given broad general powers to manage the trust corpora, including the power to mortgage, lease, or sell without license or leave of court. The trustee or trustees were exonerated from personal liability "for any loss to the trust estate or for any act or omission, or for any error or mistake of judgment or law, unless it results from his own willful or intentional misconduct or bad faith." As will be seen, the hospital shares did not, and were not expected to, pay dividends, and the Shear family home, of course, was not income producing. Hence the trusts were asset-rich but cash-poor, and it may be inferred, in light of Murray's legal entanglements at the time,[7] that a principal reason for establishing the trusts was to protect family assets from creditors' claims. (This inference is not inconsistent with Trudi's testimony that Murray's purpose was to protect the family in light of his concerns about cardiac problems.)

---

[6]"The trustees may, from time to time, pay to or apply for the benefit of the then beneficiaries any part of the net income, accumulated net income, or principal of the trust for any purpose whatever. . . . Without establishing any binding or legal direction, it is the Settlor's wish that first consideration in any distribution be given the needs of the beneficiaries while they are living."

[7]Sumner Woodrow, Murray's personal attorney at the time, testified that in the early 1970s he was defending Murray in roughly thirty creditors' actions; and there is evidence that was improperly excluded that, in the year 1971, Murray was convicted of a felony charge the nature of which the record does not disclose. See note 9, *infra.*

In 1974 Murray wanted to resign as sole trustee and asked the defendants to be successor cotrustees. Both were attorneys. Woodrow was Murray's personal attorney and business confidant (he was a director, e.g., at Doctors Hospital), and he and his wife were social friends of the Shears. Gabovitch made his livelihood as a certified public accountant and in that capacity served both the hospital and the Shear and Henry families. The two men accepted and became cotrustees on Trudi's appointment. The trusts showed negligible income and investment activity up to the time of the sale of the Shear trusts' hospital shares in 1986.

In the autumn of 1977, shortly before undergoing heart surgery, Murray told Trudi that there was another woman in his life and that, after the operation, he would be living with her. The separation lasted until Murray underwent a second heart surgery in late 1984, after which he moved in with Trudi for two months during his recuperation. Thereafter he lived separate from Trudi again until after a third heart surgery in 1990, when the two resumed living together.

After the first separation Woodrow had a conversation with Trudi, alerting her to the fact that if she contemplated divorce she would place her home in Malden at risk, because title to the home was in one of the trusts, and her rights as a beneficiary would cease on a divorce. Woodrow also discussed the trusts more generally, and the judge, accepting the largely consistent testimony of Trudi and Woodrow as to the content of the conversation, found that Trudi told Woodrow that she wanted nothing from the trusts because Murray would take care of her needs and that any business concerning the trusts should be taken up with Murray rather than herself.

During the years of the separation the trustees sent periodic accountings and addressed other communications to "G. Shear, in care of M. Shear," at Murray's separate address. Murray and Trudi remained friendly during the years of the separation, and Trudi acknowledged that Murray during that period always provided for her financial needs. The trustees took up any trust matters with Murray rather than with Trudi; and when she was required to sign documents, as when she reappointed Woodrow as trustee in 1986 (he had resigned for a period in 1985, probably due to illness), or when Trudi wanted an apartment to replace the family home in 1983, or when she borrowed $50,000

from the trust[8] the following year, it was Murray rather than the trustees who discussed the situation with her and, except for the closings on the real estate transactions, secured her signature. Trudi testified, and the judge found, that Trudi never asked the trustees to take matters up with her directly because she was content to receive communication through Murray.

In 1980 Murray, who had been, until that time, according to Richman, the dominant voice at the hospital, was removed from his position as treasurer. The judge refused to permit the trustees to put in evidence the reason for his removal. The excluded evidence would have shown that Murray in that year was convicted of a felony of undisclosed nature other than that it involved his role at the hospital, and that the sentence terms included a condition that he not thereafter occupy any position of control at the hospital.[9] The exclusion was, for reasons that will be discussed later, erroneous.

In 1980 Richman, who, since 1975, had been excluded from any active role at the hospital, served as board chairman for a period of a few months and insisted that Murray be severed from the hospital altogether. Gabovitch eventually persuaded Henry and others that Murray could, consistently with the terms of his disposition, continue to occupy a position that did not involve control of hospital affairs. Murray was then given a position called director of planning and development, occupying an office off the hospital campus in a building (101 North Common Street, Lynn) owned by Henry and rented by the hospital. In that capacity Murray continued to receive the salary and benefits he had been receiving as treasurer for four years. (Rich-

---

[8]Over the years Murray had transferred small amounts of stock shares and money into the trusts, but the dominant investment always remained the hospital shares.

[9]Despite the exclusion, allusions to the conviction appear several times in the evidence, most notably in the testimony of Richman and in a letter directing Murray to refrain from giving instructions to hospital employees, which, the letter said, violated the terms of his criminal disposition as set out in a letter from the criminal division of the Attorney General's office to Murray's defense attorney. The letter in evidence was signed by Henry as chief executive officer and Richman as board chairman.

A fuller explanation of Murray's criminal history is set out in a pretrial motion to dismiss the action filed by the trustees and not allowed. It disclosed five felony convictions in all, including one in 1971 (the year the first of Murray's two trusts was established) and one in 1984, a Federal felony conviction for securities fraud.

man apparently resigned or was removed as board chairman and did not resume control as an officer until 1984.)

In November, 1984, Murray was removed as director of planning and development. The reason for the removal, a 1984 Federal felony conviction, apparently for securities fraud (see note 9, *supra*), was, again, not admitted in evidence, which contains only an unexplained allusion to insurers raising questions about him and his connection to the hospital. It was Richman, once more in a position of control, who insisted that Murray be removed from his position. Richman also demanded that the hospital sever its connections with the Shear family's "related corporations." The import of that demand is discussed below in part 2, *infra*.

Thus frozen out from receiving the Shears' share of "the economic benefits of the hospital" — no dividends, it will be recalled, had ever been paid on the shares of stock — Murray and the family decided that Murray's relationship with his partners and the hospital had become untenable and that the hospital shares in the two Shear trusts should be sold. The shares, however, were subject to a restriction on marketability. Any shareholder desiring to sell his shares was required first to offer them to the hospital, naming a desired price. If no agreement on price could be reached, arbitrators would be appointed to determine a fair value. The hospital could, but was not obligated to, purchase at the determined price. If it did not do so, the shares could then be offered to a third party, if one could be found interested in purchasing a minority interest in a close corporation. The economics of this situation suggested the hospital or one or both of the partners as the logical buyer or buyers for the Shear trusts' shares.

Murray had not been on speaking terms with Richman since 1980, and Gabovitch, who was regarded by Richman as Murray's man but who had a working relationship with Richman and Henry, acted as intermediary for purposes of negotiating. At first Henry and Richman expressed a willingness to pay, through the hospital, only $1 million for the Shear trusts' one-third interest. The Shears were looking for $3 million (see note 10, *infra*).

In March, 1985, Gabovitch, after much negotiation, succeeded in convincing Richman and Henry to make an offer of $2 million. The terms were set out in a letter from Gabovitch and Woodrow, addressed to "The Settlor and Beneficiaries of the

Shear Family Trust and the NMI Trust," dated March 21. One million· dollars would be paid in cash at the closing and the other $1 million in the form of ten notes for $100,000, payable in terms staggered from one to ten years. The trustees recommended acceptance; their reasoning was they had failed to persuade Richman or Henry to agree to a sale of the entire hospital; that neither was willing to purchase the shares individually, so as to achieve control; that, so far as the trustees knew, there was no outside buyer interested in acquiring a one-third interest in a closely held company; that it was customary, for Federal estate tax purposes, to apply a forty-percent discount to the value of such a minority stock interest with restricted marketability, and that, applying the discount, the offered price of $2 million was the equivalent of a $10.5 million price for the entire hospital over and above liabilities (which were then almost $6 million). They pointed out that the $10 million value would represent a per-bed value of $120,000, well above what they stated was "the reported rule of thumb price of $50,000 per bed."

The Shears were not interested in the offer, feeling the price was too low, and the trustees acceded to their wish. Gabovitch suggested to Murray that he try to locate an outside buyer who would be willing to purchase at a higher price than the $2 million offered by·Richman and Henry. Murray produced an expression of interest from one Daniel Striar, who owned two proprietary psychiatric hospitals that he was in the process of selling to an entity described as "American Medical International." Striar expressed willingness to pay $3 million in cash for the Shear trusts' one-third interest, which was a price worked out by Striar and Murray Shear and apparently agreed to by all the Shears.[10] There ensued a year of discussions (these the judge excluded from evidence), during which, in August, 1985,

---

[10]Trudi, testifying at the trial, said she thought their interest was worth "more" but that $3 million was "acceptable" because it was in cash. She expounded on this in her deposition testimony, which was put in evidence at the trial, indicating that she discussed Striar's $3 million offer with all three of her sons and that they were in agreement that the $3 million offer was acceptable. There was testimony that Murray during 1985 had been offering either to buy Henry's or Richman's shares for $3 million or to sell his own to them for the same price. Bruce Shear, then president of his own company (American International Hospital Services, Inc.) had written to Henry and Richman in late 1984 suggesting a sale of the hospital for $9 million, or $3 million for each of the principals.

Richman and Henry entered into a "Joint Voting Agreement." The agreement purported to obligate them to vote together to freeze out any third shareholder.

In April, 1986, Striar, not then aware of the joint voting agreement, finally signed an offer (in purchase and sale agreement form) for the trusts' shares, accompanied by a $100,000 deposit. His $3 million offer was subject, however, to a condition: that Striar could interview either Richman or Henry or both and "if dissatisfied with the results of said interview, may declare this agreement null and void," in which event the deposit should be returned. The trustees immediately accepted the offer in writing. (The judge excluded evidence that Richman and Henry had, to that point, refused to talk to Striar.)

In late April or early May, 1986, a talk took place between Striar and Richman, and Richman told Striar about the joint voting agreement and emphasized the intention of himself and Henry to freeze out Striar or any other purchaser of the Shear shares from any possibility of control. Striar reported to Murray that Richman had given vent to unreserved anger and bitterness towards Murray, apparently stemming from the actions that were the subjects of the criminal charges. Striar testified that he had hoped, although he had not so informed Murray, to be able to strike a deal with the other partners to sell the entire hospital as part of his sale to American Medical International at a hoped-for price of $150,000 per bed (roughly $13 million), but gave up hope of dealing with the partners. Thus, Striar withdrew from the deal. On July 21, 1986, the trustees returned his deposit money. Striar was later to testify that "Richman and the other partner were unhappy with each other and with Mr. Shear. I mean I didn't realize the animosity that there was between the three of them and I felt I was stepping into a hornet's nest."

The breakdown of the Striar negotiation led to a frenzy of activity. Gabovitch tried to impress upon Richman and Henry that they were vulnerable for having chilled the Striar sale and that it was in their interest to buy out the Shears for the $3 million Striar had been willing to pay. Meanwhile, succumbing to Murray's demand (supported by Mr. Jerome Gotkin, Murray's new counsel) that the trustees file suit against Richman and Henry, Woodrow worked out draft complaints charging them with acting illegally in adopting the joint voting agreement and,

under RICO,[11] with liability for corrupt practices in siphoning off hospital assets. Gabovitch, who testified that the draft complaint was a ploy intended to prod Richman and Henry out of their intransigence, assured Richman that he, Gabovitch, would not be a party to a suit against Richman or the hospital. At the same time, however, Gabovitch also told Richman and Henry that he would resign as trustee in the near future rather than be party to such a suit, which would, of course, have left the Shears in a position to appoint a replacement trustee willing to file the suit. In any event, the suit was never actually filed, because by August Richman and Henry had come to terms with the trustees on an agreement to purchase the Shear trusts' interest in the hospital.

The terms of the agreement were detailed in a letter forwarded to Trudi on August 14, 1986, by Woodrow. No purchase and sale agreement had yet been signed, but the terms that had been settled on were as follows. The price for the Shear trusts' shares was to be $3 million, payable $1,500,000 in cash at the closing; a $500,000 note, payable in five monthly installments of $100,000; and a $1 million direct reduction note, payable in 120 monthly installments; both notes were to be secured by a mortgage on the hospital property, with the mortgage subject to an agreement to subordinate up to $3 million. On August 18, Murray's attorney Gotkin, now also acting as counsel for Trudi, demanded that the trustees not enter into a sale without again consulting the family on the terms. Trudi would "object strenuously," Gotkin said, if the sale did not include a term that, if Richman and Henry should sell the hospital within two years following the purchase of the trust shares, the trusts would receive one-third of any excess over $9 million. No other objections (including as to price) or additions were stated.

On September 19, 1986, without further consultation with the Shears, the trustees consummated a sale of the trusts' shares to MPH by signing a purchase and sale agreement and closing on the same day. The terms of the sale were as outlined in the August 14 letter, with two significant additions. The first was the inclusion of the provision suggested in the Gotkin letter — that the Shear trusts would participate pro rata in any proceeds over $9 million, if the hospital should be sold within two years. The second was a simultaneously-executed agreement generally

---

[11]The Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 (1994).

releasing Richman and Henry from any liability to the trusts on account of their actions to the date of the sale.

After the sale of the trusts' shares to the hospital, the formerly good relations between the Shears and the trustees quickly broke down. Explanations diverged. Trudi testified that she was upset with the trustees for proceeding to sell without consulting with the family again and that she did not trust Gabovitch and Woodrow any more. She asked both trustees to resign. Woodrow testified that Murray and Trudi were both initially pleased with the terms of the sale but that their attitude changed when the trustees refused to accede to the request of Murray, then of Trudi, that they resign so that Murray could take over as trustee, or, alternatively, that they turn the proceeds of the sale over to Murray. Trudi denied that the Shears' intention was to break the trusts and testified she wanted new trustees appointed other than Murray, namely, her sister and Murray's brother. Murray, although present at the trial, did not testify.

2. *Financial operation of the hospital.* From the outset, the finances of the hospital were organized to show a high cost structure at the expense of profits and dividends. The system, designed by Murray, was intended to maximize returns to the three owner families while at the same time avoiding to the extent possible liability for corporate income taxes. "Profits" were to be minimized, because they were subject to corporate income taxation whether retained or paid out as dividends, and because they were not recognized, except to a negligible degree, by the Rate Setting Commission (G. L. c. 6A, §§ 32 et seq.) as a reimbursable cost.

A word of explanation is in order. Mount Pleasant Hospital, like most hospitals, was heavily dependent on payments from patients' insurers. Some of these paid what the hospital charged; but others paid according to the hospital's costs of caring for the patients. Blue-Cross/Blue-Shield, which covered at its apogee two-thirds of MPH's patients, paid according to costs as determined by the Rate Setting Commission. The commission would only approve those costs that it determined were reasonable costs of patient care. Its formula allowed MPH only $50,000 to $60,000 per year for owner compensation, in the aggregate, as a reasonable (i.e., reimbursable) cost during the years in question here except where the commission was satisfied that an owner performed necessary services. For purposes of current payments, Blue-Cross/Blue-Shield would pay for its

patients at rates that approximated those charged to commercial insurers; but, when the hospital's financial books for the year were closed, the commission would audit the figures to weed out expenses not deemed to be reasonable costs of patient care, such as profits and excess owner compensation.[12] Then it would determine a final rate for the year; and, if an insurer such as Blue-Cross/Blue-Shield had paid more than the final rates called for, it would be owed a reimbursement of the excess from the hospital.

Under Murray's system, each of the original owners held a significant title in the hospital organization and was paid a significant salary. Henry, in the 1980s, was nominally chief executive officer; but he and his wife, as previously noted, seem to have spent the greater part of each year in Florida. Richman was the hospital's legal counsel, but the testimony, including his own, made it apparent that any actual legal work would be done by others. The record does not disclose what Murray did as treasurer in the 1970s, but his position in the 1980s as director of planning and development was described by Richman as a sham, and Trudi testified that he was running another business (a catering business, she thought) during those years. The Rate Setting Commission was later to disallow all the salaries to the three principals except for the formulaic $50,000 to $60,000, noting that MPH had a full-time hospital administrator (Dr. Daniel Rubenstein) and a full-time business manager (Bea Bonner).[13]

In addition to direct compensation to the three principals,

---

[12]The Internal Revenue Service (IRS) treats excessive salaries to a corporation's owners — that is, excessive in relation to services rendered — as constructive dividends and subjects them to the corporate income tax. See United States Treas. Reg. § 1.162-8; 1, 10 Cavitch, Business Organizations (with Tax Planning) §§ 2.04[7] and 130.01[2] (Matthew Bender & Co. 1997). The IRS, however, does not apply an inflexible ceiling to owner compensation.

[13]There are strong indications in the record that the three principals received forms of direct compensation from the hospital not included in the payroll records. "Management fees," for example, were disallowed by the Rate Setting Commission as additional owner compensation. These totalled $174,000, $205,000, and $280,000 in the years 1982, 1983, and 1984, respectively. The record does not disclose which of the principals received the fees. Other items disallowed included "officers' life insurance" and auto expenses. Six cars were either owned or rented by the hospital, and thirteen cars were charging gasoline to the hospital. The commission also disallowed travel and entertainment expenses and the expenses of Richman's visits to Israel.

each of the three had members of their immediate families on the payroll in various capacities. In Murray's case, Trudi was on the payroll during the years 1981-1986 at a salary averaging roughly $26,000 per year although she acknowledged that she did not work at the hospital after 1982. (Trudi defended this in her testimony by the fact that Eleanor Henry and Sonya Richman also were paid salaries but did not work.[14] ) Steven Shear, the eldest son, was on the payroll through 1984 as purchasing agent. Bruce Shear and Eric Shear were on the payroll in undisclosed capacities until 1983 and 1984 respectively. All told, the members of the Shear immediate family, including Murray, were paid in the form of salaries, bonuses, and wages $1,915,021 from 1973 through 1986. (The corresponding figures for the Richman and Henry families were $2,012,240 and $2,371,370 respectively.) These figures came from MPH's W-2 forms and payroll records.

A third vehicle for owner compensation involved the use of "related companies," which were companies supplying, ostensibly, goods and services to the hospital that were owned by members of the principals' families. The judge, for reasons discussed later, excluded much of the evidence concerning the operations and the finances of the related companies, impeding our ability to construct a clear picture of the relative significance of this form of income to the families.

Two of the related companies are disclosed in some detail. Evidence was admitted relating to one called Collaborative Study and Research, Inc. (CSR), offered by the Shears to show that hospital benefits went disproportionately to the other two families without protest from the trustees. CSR was created in 1982 at the insistence of Richman as a method of equalizing benefits to his family which, he felt, had been shortchanged to that point relative to the other families.[15] The shares of CSR stood in the name of Richman's daughter, and the ostensible

[14]Both Eleanor Henry and Trudi did actually work at the hospital in the 1970s. Trudi left in 1982 to copartner a leather goods store called "Midas Touch."

[15]Through 1984 the total salary and bonus payments to the Shear and Henry families had been in fact substantially ahead of those to Richman and his family, and the evidence suggested that the disparity was greater if related-company income were taken into account. In 1985 and 1986, the two years following Murray's removal as director of planning and development, payments to the Henry and Richman families gained substantially over payments to the Shear family. In 1986 Richman, who had previously acquiesced in Mur-

purpose was to commission or conduct research concerning new methods of alcoholic rehabilitation, with a focus on extranational experience and innovations. During the years 1984, 1985, and 1986, MPH paid a total of $270,719 to CSR, most of which was funnelled to an entity with an Israeli address called Mount Pleasant Hospital Addiction Studies Research Foundation. The foundation's expenditures suggested that it was the alter ego of the Richman family. The foundation entered into a memorandum of understanding with Hebrew University of Jerusalem under which it paid $5,000 to the university towards research concerning the identification and treatment of hidden alcoholics in industry; but Richman could not come up with any other concrete project of the foundation. The bulk of the money seems instead to have been spent in purchasing and furnishing a condominium in Israel for use by members of the Richman family and for reimbursing their travel expenses to and within Israel. (Richman's own travel expenses were apparently billed directly to MPH. See note 13, *supra*.) The evidence supported the judge's finding that CSR was a cover for the Richmans to receive hidden compensation from the hospital.[16]

The trustees did not attempt to show that CSR had a legitimate business purpose but rather that the other two families, and the Shears in particular, were also drawing hidden compensation through the use of "related corporations." The trustees attempted to introduce the financial records of a Shear-related company called American Medi-Labs, Inc., and a deposition relating thereto. The judge sustained the Shears' objections. The trustees' offers of proof, which included the excluded documents, tended to show that the hospital's laboratory business, done ostensibly by Granite Laboratories, Inc., one of the hospital's component (or "ancillary") corporations, was contracted out by Granite Labs to American Medi-Labs; that the sole shareholders of American Medi-Labs were Milton and Sara Levin of Florida, Trudi's retired parents (the Levins were also the directors of the corporation, and Milton was the president and Sara the treasurer); that American Medi-Labs paid as

ray's drawing down severance pay from prior year accruals, blocked release to Murray of a final $207,000 of accrued but unpaid compensation.

[16]The Rate Setting Commission disallowed payments by MPH to CSR, not on the basis that CSR was a sham (evidence of which was presumably not available to the commission), but because its regulations did not permit research to be treated as a reasonable and necessary cost of patient care.

dividends to its shareholders $489,873 from 1975 to 1986; that, in addition, a final distribution of $350,000 from earned surplus was made to the shareholders in 1986, when the corporation wound up its business; that, except for the final distribution check, the only dividends Milton and Sara had received, according to Sara in her deposition, were a monthly payment of $200 in the 1970s, rising to a monthly payment of $500 in the more recent years; that their only functions as president and treasurer were to sign and send back papers they would receive from time to time through Gabovitch; that Murray had given them their shares of American Medi-Labs, and it was Murray who had sent them their monthly checks; that Sara, who was a director and the treasurer of American Medi-Labs, knew next to nothing about the business, not knowing, for example, who determined the amount of the monthly payments, or who made the decision to wind up the corporation; that Sara and Milton used the large final payment (Sara could not remember the amount but did not think it was as large as $350,000) to purchase a condominium on William Island for Murray and Trudi, who attended the closing. Sara acknowledged that she and Trudi talked on the phone "all the time."[17]

Because of the judge's ruling excluding evidence concerning the related companies other than the Richmans' CSR, the amounts the three families derived from that source cannot be quantified. The evidence does disclose, however, that there were at least fourteen or fifteen such companies, and Gabovitch, whose accounting firm kept the books for most of them, indicated that the Shears' related companies, most of which were set up in the 1970s when Murray's was the dominant voice at the hospital, were the most profitable of the related companies. The evidence also discloses that a majority of the

---

[17]The judge excluded the financial records of American Medi-Labs, which were offered through the accountant in Gabovitch's office who prepared them, on the basis that they were not relevant. That basis is discussed in part 3, *infra*. He excluded the Sara Levin deposition for a second reason, that there was no satisfactory showing that she was unavailable to testify for the trustees. That ruling was, in our view, erroneous. Sara Levin lived in Florida and was not amenable to Massachusetts process. She had testified at her deposition in Florida under compulsion (she had previously refused to respond to discovery on Fifth Amendment grounds, and she was testifying at the deposition under a court order limiting the topics on which she could be questioned). She was, in effect, a hostile witness, and it was not reasonable to believe that she would voluntarily travel to Massachusetts to testify against Trudi and Murray.

related companies were Shear interests. The Richmans had two: CSR and Respiratory Care. The Henrys had three: Northeast Radiological, Morgan Ambulance, and 101 North Common Street. The Shears had nine or ten: American Medi-Labs (owned, as described above, by Trudi's parents); Trans-National Leasing (Murray's brother Leon); Scientific Evaluations (same); Butler Drugs; Bay State Supply; New England Hospital Supply; Jay Printing; Valley Associates; Reliance Investments (Murray's own company); and Video Concepts (set up by Eric Shear, Murray's and Trudi's youngest son, to sell videotapes of movies and TV shows to the hospital). The evidence showed also that, after Richman ordered the termination of payments to Shear-related companies, Gabovitch was nevertheless able to effect a settlement of American Medi-Lab's claim of $450,000 for $350,000 (this was used, as described above, to purchase Murray's and Trudi's condominium in Florida) and another settlement of a claim by Scientific Evaluations (amounts not shown). While the evidence, including that improperly excluded, does not permit quantification of the financial benefits to the three families from the related companies, it certainly gives no basis for concluding that the benefits were not substantial or that the Shears did not derive economic benefits from the hospital well beyond those disclosed by the payroll records.[18]

Despite the disposal of hospital surpluses through the methods listed above, at years' end surpluses remained which were dealt with as follows. Gabovitch, whose job was to keep track of the equalization of benefits, would prepare, for internal consumption, "before-adjustment" financial statements reflecting the amount of the surplus. He would then revise the figures by allocating the surplus to two reserve funds, one to refund overpayments by Blue-Cross/Blue-Shield, the balance for bonuses to the three principals, which were accrued but not immediately paid. The adjusted financial statements, which were made public, showed little or no profit and involved no substantial tax liability.

Because the Rate Setting Commission disallowed most owner compensation, as described above, the hospital would in fact

___

[18]Whether or not the $350,000 settlement with American Medi-Labs is counted, since the undisputed payroll records alone show that Murray was paid $277,000 and Trudi $44,750 during the years 1985 and 1986, the judge's finding that the Shears received no economic benefit from the hospital after November, 1984, is clearly erroneous.

owe a substantial refund of overpayments to Blue-Cross/Blue-Shield. The reserve fund anticipated this, and the amounts reserved from 1981 through 1986 (totalling $4.6 million, roughly) proved substantially accurate. Despite the refund of overpayments, the system was profitable for several reasons. First, it avoided corporate income taxes. Second, no interest had to be paid on the overpayments, so the hospital had the benefit of the float, magnified by the fact that the Rate Setting Commission was delayed during the 1980s in getting to final audits (i.e., the audit covering the years 1981 through 1986 was not performed until May, 1988). Third, no refund was owed to commercial insurers who paid on the basis of charges rather than costs. Lastly, the commission, while its audit caught direct salaries and bonuses to Henry, Richman, and Murray, as well as management fees, expense accounts, and the like, seems not to have gone behind salaries paid to family members or, for the most part (it did disallow payments to CSR and 101 North Common Street) to accounts billed by the related companies. Thus, the founding families were able to receive reimbursement for income derived from many more or less core hospital functions, such as lab work, radiology, respiratory care, equipment leasing, and so on.

Beyond suggesting that the hospital provided a lucrative source of income to the three families in excess of the figures shown in the hospital payroll records, the record does not furnish a basis for determining the extent of the benefits they received or, in particular, for determining that the Shears were disadvantaged relative to the other families in the distribution of benefits, at least through 1984, when, after Murray's fifth conviction, the freezeout began. And, even then, in 1985 and 1986, he and Trudi together, as described in note 18, *supra*, were paid a total of $321,750 in salary and indirectly were the beneficiaries of at least the $350,000 settlement with American Medi-Labs.

Those of the judge's findings, however, that predicate the trustees' liability for surcharges on Gabovitch's complicity and Woodrow's acquiescence in a system that systematically disadvantaged the Shear family are, upon careful examination of the entire record, without support, because the system, so far as the record shows, did not disadvantage the Shear family until some time after the freezeout began in November, 1984.

3. *Murray Shear as agent for Trudi Shear.* It is inevitable, in

long trials, that errors will be made by any judge; more often than not, these errors have no appreciable impact on the outcome of the trial and can be treated as inconsequential. Certain errors in this case, however, were not inconsequential but had a pervasive, distorting influence on the trial and the outcome. The most pervasive of the errors lay in the judge's rulings during the trial, and ultimately in his findings, on the issue of whether Murray Shear acted as agent for Trudi Shear.

Trudi was the first witness. Asked by her counsel whether she had ever designated Murray to represent her with respect to trust matters, she answered negatively. That answer, coupled with the absence of a writing whereby Trudi designated Murray to be her representative, or agent, caused the judge to exclude, for the balance of the trial, virtually all evidence concerning Murray's active involvement in and knowledge of affairs at the hospital and the negotiations to sell the Shear trusts' hospital shares. What Murray knew and did was treated as irrelevant. The judge's view was that "Murray is not involved in this case."

Predicated on his view that Murray was not Trudi's agent, the judge, throughout the trial, and in his later findings and conclusions, treated the trustees as having been in a twelve-year-long breach of their fiduciary obligation to keep the beneficiary informed due to their failure to discuss directly with Trudi everything of significance about the trusts and the hospital: for failing to send the annual accountings directly to her, rather than indirectly through Murray; for failing to inform her that the hospital was not paying dividends to the trusts; for failing to disclose to her that Henry and Richman were paying themselves and their relatives sizeable amounts for services that were not rendered, thereby dissipating profits; for failing to inform her about Murray's removal as treasurer in 1980 and as director of planning and development in late 1984, and to discuss with her what they should do in response; and for failing to discuss with Trudi at each stage how they should handle the business of selling of the trusts' hospital shares. Evidence that Murray had established the system of excessive or fictitious salaries so as to conceal profits, as well as evidence that the trustees, and Gabovitch in particular, were in almost constant communication with Murray about matters at the hospital and about the negotiations for the sale of the Shear trusts' hospital shares, were all treated as irrelevant and generally excluded.

The exclusions of Murray's 1980 and 1984 convictions left his removals, first as treasurer, then from the payroll altogether, unexplained, creating an appearance of gratuitous acts of hostility.[19]

The existence of an agency relationship is ordinarily a question of fact, *Stern* v. *Lieberman*, 307 Mass. 77, 81 (1940), not to be reversed unless clearly erroneous. Trudi testified that she never authorized Murray or anyone else to represent her in reference to the trusts. The judge's finding that Murray was not her agent, insofar as it reflects that testimony, is not clearly erroneous. Indeed, it is consistent with the testimony generally, for Murray never purported to act as her agent when formal action was required. In the appointment of successor trustees, for example, it was she, not Murray, who executed the documents.

The judge erred, however, in not recognizing the existence of a more limited agency, created when Trudi told Woodrow to take up trust matters with Murray rather than with her. In that conversation, the judge found, Trudi told Woodrow that she was not looking to the trusts for support, that Murray, despite their separation, would take care of her financial needs, and that Woodrow should discuss trust or other business affairs with Murray. As matter of law, these instructions by Trudi to Woodrow established an ostensible or apparent authority in Murray to act for her for the limited purpose of receiving communications and discussing business with the trustees relative to the trusts. There was nothing untoward in this arrangement. Murray was Trudi's trusted confidant in matters of money, a relationship that continued during the period of separation, and she obviously preferred to discuss finances with him rather than the trustees. The judge seems to have been troubled by the fact that no writ-

---

[19]The judge's findings even attribute hostility to Gabovitch. Regarding a meeting at which Gabovitch was trying to persuade the partners to make an offer for the Shear shares, the findings state: "It was felt at the meeting that the best way to get rid of Mr. Shear was to buy him out. Moreover, Gabovitch felt that because of the uncomfortable relationship between himself and Mr. Shear that it would be best to buy him out." This finding is a distortion of the record, because it was clear, even with the numerous exclusions of Murray's role, that Gabovitch was acting *for* Murray in trying to generate an offer from Henry and Richman. (The reference to "the uncomfortable relationship" is based on an ambiguous statement in a Richman deposition, which Richman did not adopt at the trial. The deposition itself was not in evidence, and the finding not only lacks an evidentiary basis but is wholly at variance with the tenor of the evidence.)

ing by Trudi established an agency[20]; but an apparent or ostensible authority is established by "spoken words or any other conduct of the principal which, reasonably interpreted, causes a third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him." *Weisman* v. *Saetz*, 11 Mass. App. Ct. 440, 442 (1981), quoting from Restatement (Second) of Agency § 27 (1958). The trustees can hardly be faulted for sending trust communications to, and discussing trust matters with, Murray, rather than Trudi, when that is what she instructed them to do. Moreover, we are aware of no authority, and can think of no rationale, to support the Shears' argument that her instructions were to be disregarded because they were communicated directly to only one of the trustees.[21]

Emphasizing that the trustees' reliance on Trudi's instructions

---

[20]Illustrative is the judge's reasoning in excluding evidence of Murray's participation in the negotiation:

COUNSEL: "[E]verybody understood the fact that Murray Shear was communicating with her [i.e., Trudi]."

JUDGE: "But there was never any writing to that effect . . . . I don't see any writings to that effect."

". . .

COUNSEL: "Let me remind the court of her testimony that she was dating with her husband, she saw him, he paid all the bills, he took care of her business affairs. . . ."

COUNSEL FOR TRUDI: "Objection."

JUDGE: "Well, he might have taken care of her business affairs — he may have taken care of her bills and so forth because he felt his obligation to do so because it was his wife, he wasn't divorced from her. He simply was living apart. He still had an obligation, under a legal obligation."

". . .

COUNSEL: "I understand what you're saying but I urge you to realize how this family operated. I mean, Murray Shear was the boss and he was running around communicating with these guys all the time."

JUDGE: "They — but the trustees had an obligation, nevertheless, to communicate with Gertrude Shear. That's the — that's black-letter law. They had a legal obligation to communicate with Gertrude Shear. Not with Maurice — Murray Shear."

COUNSEL: "But — but if they communicated with Murray Shear and he communicates with Gertrude Shear, then they communicated."

JUDGE: "No, I don't think so."

[21]Unlike Gabovitch, who, despite his closeness to Murray, was principally a business acquaintance, Woodrow and his wife were social friends of the Shears and had been invited by the Shears to parties at their home and on

must be reasonable, see *Hudson* v. *Massachusetts Property Ins. Underwriting Assn.*, 386 Mass. 450, 457-458 (1982), the Shears argue that the trustees' reliance was not reasonable because of the judge's finding that they were acting in bad faith. This is plainly circular, where the finding of bad faith was itself derived in part from the judge's view that the trustees violated their fiduciary duty by communicating directly with Murray rather than with Trudi. What *is* relevant to the reasonableness of their reliance is the background disclosed by Trudi's own testimony. Trudi was a high school graduate with no business experience other than the retail store (see note 14, *supra*) that she and a partner were to open several years later. She acknowledged that she relied entirely on Murray to handle business affairs and that, despite the period of separation, she and Murray remained friends. Murray was faithful during that period about taking care of her bills and the financial needs of the family. Before the separation, Murray had talked with her about the two trusts and their purpose. She acknowledged that she was privy to the concept that the three families would share benefits equally. She admitted being knowledgeable of the employment of her entire family on the hospital payroll, of the fact that she and the other wives drew salaries whether or not they worked; and it is inconceivable on the record that she was unaware of her parents' role in American Medi-Labs. When, in 1974, Murray resigned as trustee and asked Woodrow and Gabovitch to become the successor cotrustees, Trudi executed the appointment papers for the new trustees. She knew what property was in which trust. In 1982, when she wished to sell her house and purchase another, she and Murray sat down with someone from Woodrow's office to execute the necessary papers at the closing. (Although she could not remember the exact details, she understood that the trustees were transferring the title of the house from the family trust.) About a year later, when she needed $50,000, Murray arranged with Woodrow to have her borrow the money from one or both of the trusts, and she signed a note for that amount. (She did not have to make payments, and the note was eventually discharged by application of investment income from the proceeds of the sale of the hospital.) In 1985, when Woodrow resigned as a trustee, Murray persuaded him to return, and Trudi executed the reappointment paperwork in June of 1986.

their boat. Trudi's testimony indicates that around the time of the separation she was having conversations with Woodrow's wife by phone.

. At all stages of the process of selling the hospital shares, Murray seems to have kept her informed. She approved of selling, she testified, because she saw no reason to keep the shares if the Shear family was being cut off from the benefits. Murray discussed the original $2 million offer with her; she agreed it was too low a price. She was aware of the discussions regarding sale of the hospital between Bruce Shear and Gabovitch. She approved the Striar offer; the $3 million price, in cash, was acceptable to her. Murray and she discussed the collapse of the negotiations, and she saw the Striar correspondence, just as she had seen the $2 million offer documents, and was shortly to see the correspondence from the trustees outlining the proposed terms of the $3 million sale of the shares back to the hospital. She acknowledged that the Gotkin letter fairly expressed her concerns about the imminent sale. (The letter, it will be recalled, did not question the selling price or the payment terms.) Despite Trudi's oft-repeated complaint at trial that the trustees did not communicate with her from 1974 to 1986,[22] one cannot read her testimony and come away with any conclusion other than that Murray kept her fully conversant with the significant affairs of the trusts and of the hospital. Indeed, the judge specifically found, based on Trudi's own testimony, that she never asked the trustees to start talking with her directly because she was "not unhappy" with having Murray act as intermediary with the trustees. Compare *Fennell* v. *Wyzik*, 12 Mass. App. Ct. 909, 910 (1981); *Dhanda* v. *Tri M, Ltd.*, 24 Mass. App. Ct. 700, 706-707 (1987); *Philip Morris, Inc.* v. *Litel*, 30 Mass. App. Ct. 936, 937-938 (1991).

The judge's finding that, in effect, Murray was not Trudi's agent for any purpose at all, including communications with the trustees, was in conflict with his finding concerning her instructions to Woodrow and contrary to the overwhelming weight of the evidence as to the relationship between her and Murray. The finding is not "plausible in light of the entire record." *Demou-*

---

[22]E.g., "Nothing came to me directly"; "I have never received any information from the trustees, personally, at all"; "My trustees never told me anything." In light of Trudi's later testimony showing her knowledge of and involvement in the hospital's distribution of benefits, the judge's findings relative to Trudi's awareness of hospital affairs were generally in the form that she was ignorant except for what Murray told her. Such findings say nothing of what she knew. (In pretrial depositions Murray and Trudi both refused repeatedly to disclose the content of their conversations, claiming husband-wife privilege. See note 29, *infra*.)

*las* v. *Demoulas Super Markets, Inc.,* 424 Mass. at 510. It was, in our view, clearly erroneous, as were the ancillary exclusions of evidence on the basis that Murray's activities were of no relevance.

4. *The trustees' liability for the failure of MPH to pay dividends on the Shear trusts' shares.* As described, the judge imposed liability on the trustees for Gabovitch's complicity and Woodrow's acquiescence in the system established by Murray, under which any profits remaining after salary payments to family members and allocations to related companies would be allocated to bonuses for the three principals, so that no surplus was available from which dividends might be paid. The judge's legal premise was that the trustees were obligated as matter of law to put the beneficiaries' interests above all other interests and that, as applied to this situation, it was the duty of the trustees to work to stop the hospital's historic practice of diverting profits into salary and other distributions to the families, in favor of a system under which profits would be realized and dividends paid on the trust stock. This was too narrow a view of the trustees' duty.

While it is basic that a "trustee's first duty is the protection of the trust estate," *Johnson* v. *Witkowski,* 30 Mass. App. Ct. 697, 706 (1991), and that a trustee often has a duty to act with respect to unproductive or underproductive investments, *Springfield Safe Deposit & Trust Co.* v. *Wade,* 305 Mass. 36, 39 (1940); *Rutanen* v. *Ballard,* 424 Mass. 723, 728-730 (1997), these propositions must be applied in light of the fact that the hospital was the Shears' family business and, so far as we know, their and the Richman and Henry families' principal source of income. The profit distribution system was in place before the Shear trusts (and, indeed, the other families' trusts) were established, and it was manifestly not the intention of the settlors to alter that lucrative system when the trusts were established. Murray put his hospital shares in the two Shear trusts, in other words, knowing that they had never paid a dividend and that they were never expected to pay dividends. Trust documents and the duties they impose on trustees must be read in the light of the circumstances known to the settlor at the time a trust is established. 2A Scott, Trusts § 164.1, especially at 255, 257, 259 (Fratcher 4th ed. 1987). Murray, the original trustee, obviously did not try to alter the system and push for dividends when he was trustee or in the years thereafter when

he remained a controlling voice at the hospital. Not surprisingly, the record is barren of any complaint by the Shears about the hospital's profit distribution system until the claim was made by Trudi in her March, 1987, complaint.[23]

Relevant authority is to be found in cases where the settlor, head of a family business, puts the shares in trust for the benefit of his family. In such cases, the trustee is frequently the chief executive officer of the business or at least one of the directors. Family members' complaints about the business's dividend policy, or the allocation of jobs to family members, generally yield in decisions to the primacy of the business's commercial needs. See, e.g., *Estate of Gehl*, 5 Wis. 2d 91, 97 (1958) ("The failure of this family corporation to pay dividends when the trustees acting as directors believed it was in the best interests of the company and sound business practice not to pay dividends in order to expand the company to keep its competitive position in the industry does not amount to a lack of good faith on the part of the trustees"); *Russell* v. *Russell*, 427 S.W.2d 471, 476-478 (Mo. 1968) (court rejected argument that majority shareholders who were trustees had a duty to the beneficiaries to cause corporation to declare dividends, forgoing the exercise of discretion as directors); *Schildberg* v. *Schildberg*, 461 N.W.2d 186, 192 (Iowa 1990) (court refused to remove trustee who, in his capacity as CEO of family business, paid no dividends and refused preferential treatment to family employees). It is not necessary, in such cases, that the intent of the settlor that the trust hold nondividend paying stock be expressed in the trust document if it is evident from the circumstances in which the trust was created. *Russell* v. *Russell*, 427 S.W.2d at 478. See 2A Scott, Trusts § 164.1. The judge erred in ruling that the trustees had a legal duty in this situation to press for declarations of dividends or to initiate litigation to terminate the profit distribution system of which the Shear family, Trudi included, were all beneficiaries.

The other points to note: (1) Trudi was a *life* beneficiary, not an *income* beneficiary; her interest was not limited to current income. Contrast *Rutanen* v. *Ballard*, 424 Mass. at 724. (2) She made it clear to Woodrow that she was looking to Murray, not to the trusts, for support. (3) The hospital shares were not an

---

[23]The Shears did complain, of course, after the freezeout had begun, that Richman and Henry were taking more than their share; but no suggestion was made that dividends should be paid on the shares until suit was brought.

unproductive investment, despite the absence of dividends. The one-third interest provided an ample income to the Shear family, and it provided not only security but also capital growth (apparently $3 million worth) to the beneficiaries. No basis is shown on this record for surcharging the trustees for the hospital's no-profit, no-dividend policy.[24]

5. *The trustees' liability arising out of the sale of the Shear trusts' MPH shares.* The judge surcharged Gabovitch and Woodrow $664,880, representing the difference between the $3 million that the trustees received on the sale and the larger amount the judge determined they should have received. The larger amount was based on the expert testimony of one Howard Gordon that the fair market value of the entire hospital as a going entity at the time of the sale in October, 1986, was $10,994,639 and, consequently, that a one-third share was $3,664,880. The trustees argued that the valuation so computed must be reduced by a minority discount, reflecting the fact that it was not the hospital but the Shear trusts' minority shares in the hospital that were offered for sale. The judge accepted instead the argument of the Shears' trial counsel that minority discounts should not be applied in freezeout situations.

As applied to this case, the ruling was in error. It treated the trustees, in effect, as if they were the majority shareholders, responsible for an illegal freezeout, while in fact they, as the

---

[24]The judge regarded it as having been within the trustees' power to declare dividends. "Furthermore," his findings stated, "Gabovitch at all relevant times during the period [i.e., 1981-1986] handled the disposition of such pre-tax profit and could have, if he wished, declared dividends for the benefit of the Hospital shareholders including the Trusts." This finding is clearly erroneous. Understood literally, it is erroneous because Gabovitch and Woodrow were not directors of the hospital and could not declare a dividend. Taken as a reference to their control of the voting power of the Shear trusts' shares, it is erroneous because there is nothing in the record to support a finding that Henry or Richman would have cooperated in changing the hospital's profit distribution system. The judge's finding that Richman suggested paying dividends but Gabovitch vetoed it is a distortion of Richman's testimony that they discussed dividends as a possible way of replacing Murray's lost salary and that Gabovitch observed that if dividends were to be paid on the Shear trusts' shares, they would have to be paid on all the shares. Taken in context, Richman's view was expressed in his testimony that, "the way the system worked, the name of the game was to get the money that would be reimbursed. That is why dividends, payments to the trusts meant nothing. There were not supposed to be any dividends. There were supposed to be salaries, there were supposed to be services, supposed to be whatever the Rate Setting Commission would recognize."

holders of the minority shares, were, like the Shears, the victims of the freezeout. The freezeout confronted the Shears and the trustees with a common problem of finding the best price for the Shear trusts' shares. Despite unsupported findings suggesting that the trustees were working at cross-purposes to the Shears (those findings are discussed in part 6, *infra*), the evidence read as a whole showed that, occasional tactical disagreements aside, they worked in concert to obtain the highest price from Richman and Henry. It is true that a minority discount is often inappropriate where minority shares are being sold to the majority shareholders. 12B Fletcher, Cyclopedia of Private Corporations § 5906.120, at 435 (1993).[25] In such a situation, the minority shares are freed from the limitations of minority status, and there is no reason the sellers should not receive full, i.e., undiscounted, value. Thus, typically, in an appraisal under the provisions of G. L. c. 156B, §§ 86-98, the price the corporation must pay for minority shares is fair value determined, as the judge did here, by finding the value represented by all the shares and apportioning pro rata. See *Martignette* v. *Sagamore Mfg. Co.*, 340 Mass. 136, 138-143 (1959); *Piemonte* v. *New Boston Garden Corp.*, 377 Mass. 719, 724-734 (1979); *Sarrouf* v. *New England Patriots Football Club, Inc.*, 397 Mass. 542, 544-551 (1986). In an appraisal, however, or in an equivalent contractual arrangement, the majority shareholders are obligated to buy the minority shares. That was not the situation that faced the trustees.

The trustees were not in a position to force Richman and Henry to purchase their shares at fair market value or any other price. They could not demand a statutory appraisal — it was the Shears, not the majority shareholders, who were proposing a sale of the hospital (see G. L. c. 156B, §§ 75 and 76). While the trustees could invoke the arbitration process set out in the stock restriction, and thereby secure an impartial determination of a fair value price, the hospital was empowered but not obligated to buy at that price. It is not surprising, therefore, that the Shears did not suggest resort to the arbitration process.

[25]See, e.g., *Coggins* v. *New England Patriots Football Club, Inc.*, 397 Mass. 525, 536-537 (1986); *Sarrouf* v. *New England Patriots Football Club, Inc.*, 397 Mass. 542, 548 (1986), both affirming the trial judge's ruling that the appropriate value of the minority's interest is a pro rata share of net asset value. Those cases, however, involved appraisal situations. The defendant was the corporation controlled by the majority shareholder.

Thus, while the Shear trusts' shares might theoretically be worth $3.6 million to the majority shareholders, there was little reason for them to offer more than an outside buyer might be willing to pay for a market-restricted minority position in a close corporation. It makes no practical sense to say that the trustees *should* have been able to sell at $3.66 million merely because the shares were theoretically worth that much to Richman and Henry, because they were not obligated to buy.

In these circumstances, the judge's finding of value, by "fail-[ing] to take any notice of the encumbered marketability of a minority block of stock in a closely held corporation, . . . [was] fundamental — hence clear — error . . . ." *Fechtor* v. *Fechtor*, 26 Mass. App. Ct. 859, 863-864 (1989). See *Rogers* v. *Rogers*, 296 N.W.2d 849, 852-853 (Minn. 1980); *Amodio* v. *Amodio*, 70 N.Y.2d 5, 7-8 (1987); *Scalchunes* v. *Scalchunes*, 134 A.D.2d 337, 338 (N.Y. 1987), all discussed in *Fechtor, supra* at 865. "A minority discount recognizes that controlling shares are worth more in the market than are noncontrolling shares," 12B Fletcher, Cyclopedia of Private Corporations § 5906.120, at 435, and that "[m]arketability problems often affect shares of closely held corporations." *Id.* at 436. A minority discount was required here to reflect the reality that the trustees and the Shears could not *force* Richman and Henry to purchase the Shear trusts' shares and that the only alternative, an outside buyer, would be expected to offer less than fair value for noncontrolling shares of restricted marketability in a close corporation.

The actual course of negotiations, as set out earlier, was that the target price, $3 million, was set by the Shears. Murray's proposal for sale of the Shear trusts' shares to the hospital for $3 million, or, alternatively, for the purchase of either Richman's or Henry's shares for the same price, was refused. Bruce's suggestion to sell the entire hospital for $9 million came to naught because Richman and Henry were not interested in a sale. Prior to the Striar offer, the best offer Gabovitch could elicit from Richman and Henry was the March, 1985, offer of $2 million that the Shear family rejected. Only after the Striar offer collapsed in July, 1986, and Richman and Henry were threatened with litigation for chilling the Striar deal, were the trustees able to elicit an offer that met the Shears' target price.

The trustees could not properly be found remiss for failing to attempt to market the shares through normal, commercial

brokerage channels. The market for a minority position in a close corporation would be small and specialized. They could properly rely on the Shears, particularly Murray and Bruce, who were professionals in hospital investing and administration, to know the market and the potential buyers. The judge suggested that Murray's ability to interest Striar in making an offer showed how easy it was to find a buyer at $3 million.[26] It was more than a year, however, before Striar produced an actual offer with a deposit; and when he did, the offer was conditional on his (Striar's) complete satisfaction after talking with Richman and Henry. It was tantamount to an illusory offer.

The judge also, in effect, faulted the trustees for the collapse of the Striar offer, suggesting that the outcome would have been different if the trustees had brought litigation against Richman and Henry to have the joint voting agreement declared illegal. This conclusion, too, is, in our view, clearly erroneous. Such a declaration could matter little to Striar as long as Richman and Henry were disposed to vote together. As Striar made clear, the deal fell through because he could not interest the other owners in selling the hospital.

The portion of the judgment surcharging the trustees $664,880 for selling the shares for an inadequate price has no sound basis, either as to the finding that they were in breach of their duty as trustees, or as to the computation of damages. It must be vacated.

6. *The trustees' good faith.* The judge found that the trustees "wilfully failed to exercise good faith." The findings list twenty-two categories of breach, which we read as constituting the bases for the conclusion that the trustees failed to exercise good faith. Many of the categories of breach have been dealt with above. Five, for example, are variations on the theme that the trustees communicated to Murray instead of Trudi. Three involve Gabovitch's participation in the profit distribution, pay-no-dividends scheme, and the trustees' inaction in suing to recover payments to the Richman and Henry families to enable the money to be applied to dividends. Two others involve

---

[26]The judge found: "Gabovitch and Woodrow suggested to [Murray] that he go out and find a buyer if he wanted a better price [than the $2 million then being offered by Richman and Henry]. They themselves took no steps to find an independent third party purchaser." "[Murray] located a buyer for the Hospital in quick order." "[Striar] offered [Murray] $3,000,000.00 to purchase the Trusts' interest in the Hospital."

failures to sue Richman and Henry, one to stop the freezeout, the second to void the joint voting agreement. Gabovitch's expressed view, echoed also in Woodrow's testimony, was that the totality of the hospital's financial operation was vulnerable to scrutiny and that litigation would prove damaging to the interests of all three families. That view was borne out by events, and, for purposes of analyzing this case, it was a reasonable and prudent judgment, hardly a basis for a finding of breach of fiduciary duty. To Gabovitch and Woodrow, litigation was useful only as a threat. As to Gabovitch's statements to the effect that he would personally not be a party to a suit, he also made it clear to Richman that, by resigning, he would not stand in the way of such a suit.

Two of the breaches concerned the trustees' inactivity in effecting a sale of the Shear trusts' hospital shares. One faulted the trustees for not themselves seeking a buyer; but here, as we have said above, it was reasonable for them to rely on the Shears' own greater expertise and familiarity with the market. On the failure to seek an independent appraisal of the value of the hospital, Gabovitch's view, reasonable in the circumstances, was that this would be a waste of money, that any "expert" opinion of the value of the minority interest would be speculation. None of these judgments was a violation of fiduciary duty, much less a bad faith violation.

Quite inexplicable inclusions are two that faulted the trustees for "participat[ing] in the development of" the $2 million offer in March, 1985, and agreeing to it and recommending it to the Shear family. Against Richman's resistance (he wanted to make no offer and instead to sue Murray for using his hospital position for criminal activities), Gabovitch negotiated to get an offer, and the $2 million offer was the best he could get at that time. The trustees did not themselves agree to the offer. They consulted with the Shear family, explaining their reasons for thinking it reasonable, and they abided by the Shears' desire that the offer be rejected.[27]

Three of the listed breaches relate to the trustees' entering

---

[27]These findings are illustrative of the pejorative terminology that characterizes many of the findings, viz: "Gabovitch's agreement in March, 1985 with his brother-in-law, sister-in-law and Mrs. Bonner (with Woodrow's knowledge) to offer to buy out the Trusts' Hospital shares for $2,000,000.00 in order to get rid of Mr. Shear because Gabovitch was uncomfortable with him." The "uncomfortable" reference was based on a remark Richman made in a deposition that was not in evidence at the trial and was totally at variance with Rich-

into the sale without clearing it with Trudi, and agreeing to terms argued to be disadvantageous. Fiduciary duty did not require the trustees to accede to Mr. Gotkin's demand that they give the family the final say on the sale. These were not nominee trusts, and as matter of law the judgment whether the sale was advantageous to the trusts lay ultimately with the trustees, not with the beneficiaries or the settlor. See Restatement (Third) of Trusts (Prudent Investor Rule) § 190 (1992); 3 Scott, Trusts §§ 190, 190.5 (Fratcher 4th ed. 1988); Loring, A Trustee's Handbook § 3.5.3.1 (Rounds & Hayes 7th ed. 1996). They complied with their duty of disclosure and consultation by apprising the family of the major terms of the proposed agreement before committing themselves to the purchase and sale agreement. They incorporated the single specific provision suggested by the family — participation by the trusts in any sale of the hospital for a price in excess of $9 million over the ensuing two years. The provision for subordination of the trusts' mortgage to a possible later mortgage borrowing is not shown to have been unsound business judgment.[28]

The provision releasing Henry and Richman from liability to the trusts for prior acts can hardly have come as a surprise to the Shears. The threat of litigation had served its purpose when

man's and Gabovitch's testimony. See note 19, *supra*. The "in-law" innuendo was based on the fact that Gabovitch's wife of forty years was Richman's sister. Despite that fact the record is overwhelmingly clear that relations between Richman and Gabovitch were strained because of Richman's hostility towards Murray and his view of Gabovitch as "Shear's man" due to Gabovitch's constant efforts to ensure that the Shears received their one-third cut of profits after the conviction and removal of Murray in 1980. In contrast with the other two families, the Richmans did not employ Gabovitch as their personal accountant.

[28]On objection by the Shears' trial attorney, Gabovitch was precluded from explaining why the trustees regarded the possibility of subordination as presenting no substantial risk to the trusts' mortgage position (which secured the $1 million, level paydown, ten-year note). The exclusion was erroneous because, under the exculpation clause, the trustees' good faith was in issue. (The loan was apparently contemplated to cover the hospital in the event that the amounts reserved by Gabovitch to pay the refund that would be due to Blue-Cross/Blue-Shield might prove insufficient. The reserves, however, proved roughly accurate.)

When the $1 million note fell into default after thirty-six or thirty-seven of the contemplated 120 payments, the trustees bought out a prior mortgage securing a small balance remaining on a note (called "the ConFed loan") the hospital took out in the early 1970's. The record mentions no other prior mortgage position.

Henry and Richman agreed to the $3 million buyout. The release was not, as the Shears would have it, an example of the trustees giving away something valuable for nothing. It was part of a larger business deal, and it would not have been reasonable to expect that Henry and Richman would agree to close if the threat of litigation were left hanging over their heads.

Two of the faults related to Gabovitch's "conflicts of interest." The conflicts referred to the many entities for which Gabovitch's firm acted as accountant. These included the hospital, each of the ancillary corporations, most of the related companies, and the Shear and Henry families. Serving as accountant to all these entities put Gabovitch, the judge found, in a position that compromised his overriding duty of undivided loyalty to the Shear trusts' beneficiaries. Two particulars are cited: (1) his role as accountant to the hospital and adviser on financial affairs to the three principals and (2) his role as accountant to Richman's second related corporation, CSR. These two are cited as illustrative of actual, rather than potential conflicts, in that each put Gabovitch in the position of diverting to others profits that, rightfully, should have been paid out as dividends on the hospital stock. In part, we find ourselves retreading old ground, as we have already seen that the profit diversion system was established by Murray for the reason that it was more beneficial in financial terms (taxes, reimbursements) to the three families than the conventional system of realizing profits and paying dividends. The later created trusts presupposed Murray's system. CSR, of course, differentially benefitted the Richman family at the expense of the Shears (and Henrys); but so did all the related companies, the greater numbers of which, and, according to Gabovitch, the most profitable of which, belonged to the Shears. What is lacking on this record is any showing that Gabovitch's role in suggesting and implementing CSR was in any manner inconsistent with the role he played at the hospital from its earliest days in trying to equalize the distribution of hospital benefits to the three families.

Qualifying the general principle that a trustee has an overriding duty of undivided loyalty to the trust beneficiaries and should avoid obligations that might conflict with that duty, see *Jose* v. *Lyman*, 316 Mass. 271, 278 (1944); *Johnson* v. *Witkowski*, 30 Mass. App. Ct. at 706, is a principle that comes closest to governing the facts of this dispute, set out recently in *Symmons* v. *O'Keeffe*, 419 Mass. 288, 298 n.9 (1995).

"[The trustee's] different and potentially conflicting duties arising from his different positions (i.e., his duty as trustee to act in the interests of the beneficiaries and his duty as a corporate officer and director to act in the interests of the corporation) do not create grounds for his removal. In acting in his corporate role, [the trustee] may sometimes have to subordinate the interests of the trust beneficiaries to those of the corporation. The settlor of the trusts . . . knew, at the time he created the trusts, that [the trustee] held and would hold these various positions. The plaintiffs cannot obtain relief on these facts. See Restatement (Second) of Trusts § 107 clause a, comment f (1957) ('The court will not ordinarily remove a trustee named by the settlor upon a ground existing at the time of his appointment and known to the settlor and in spite of which the settlor appointed him . . .'). See also 2 Scott, Trusts § 107.1, at 118."

There are, to be sure, points of difference: it was Trudi, not Murray, the settlor, who, technically, appointed Gabovitch cotrustee, and Trudi, according to the judge's findings, was not told of Gabovitch's multiple roles. But if Trudi did not know or appreciate the nuances, it was because she chose to rely on Murray for information and counsel in her finances, as she relied on Murray for guidance in selecting the cotrustees to replace himself. Compare *Edinberg* v. *Cavers*, 22 Mass. App. Ct. 212, 215, 223 (1986). In the circumstances of the case, Murray's knowledge must be attributed to Trudi.[29]

While Richman thought of Gabovitch as "Shear's man," because he acted for the Shears in relations with the other families (including the sale negotiations and the settlements

---

[29]The pretrial motion to dismiss (see note 9, *supra*) suggests that it was particularly difficult for the trustees to learn of Trudi's actual knowledge in discovery. Trudi, it alleges, invoked the husband-wife privilege twelve times, the attorney-client privilege twenty-two times, and claimed no memory 279 times. Murray invoked the privilege against self-incrimination 576 times, the husband-wife privilege twenty times, the attorney-client privilege nine times, and loss of memory 134 times. The sons were equally uncommunicative in discovery. Steven Shear, who, as purchasing agent, presumably was in a position to know detail concerning the profits from the related companies, invoked his Fifth Amendment privilege 699 times, attorney-client privilege twenty-seven times, and failure of memory twenty-six times. The corresponding figures for Bruce were 162, two, and 148 times, respectively; for Eric, 375, eight, and thirty-one times.

with American Medi-Labs and Scientific Evaluations), he was also described as being the peacemaker among the families. At one point, asked whom Gabovitch was representing at a particular meeting, Richman answered, "Gabovitch was always representing everybody." Gabovitch's propensity for even-handedness in dealing with the families was known to Murray when he arranged for the succession of trustees, and Gabovitch, so far as the record shows, served the trusts and the Shear family well by keeping open lines of communication in the midst of hostility, so as to enable the hospital to keep functioning. Gabovitch and Woodrow both resisted certain of Murray's demands, such as that they initiate RICO-based litigation against Richman and Henry, feeling reasonably that the Shears were equally vulnerable to such charges and that litigation could prove, as it did, ruinous to the hospital. Like an attorney who resists the more extreme demands of his clients and thereby serves his client better, Gabovitch and Woodrow were required neither by their role as trustees nor by the law to be unthinking sycophants for Trudi or Murray. Whatever else may be said of the roles Gabovitch filled for the hospital and the trusts, he was not, up to and including the sale of the hospital shares, disloyal to the trusts or to the Shears.

7. *Events following the sale of the trusts' hospital shares.* Almost immediately following the sale of the shares, the Shears demanded the resignation of the trustees. Both refused, and, whether in response to the family's hostility or to the newly cash-rich position of the trusts, the trustees, who, during the twelve years they had served in that capacity, had never discussed the subject of trustee fees with either Murray or the beneficiaries, paid themselves fees for the entire period. They computed their fees by adapting the fee schedule of a large Boston bank, applying annual fees of six percent of income and one-tenth of one percent of principal for each of the twelve years to principal and income figures elaborately calculated by working back from the purchase price, year by year, assuming a uniform annual accretion in value to the date of the sale. They paid themselves the total fees thus calculated, $268,175, during December of 1986 and January of 1987. In addition, they paid Woodrow a legal fee of $25,000 for services during the negotiation and closing of the sale.

In March, 1987, Trudi brought suit against the Richmans and the Henrys for waste of hospital assets and against Gabovitch

and Woodrow to remove them as trustees and to assess damages for alleged breaches of fiduciary duty. The litigation was conducted with a vehemence that led all parties to incur major expense.[30] On the eve of trial, the Shears reached a settlement with the Richmans and Henrys that called for zero compensation. The trustees, meanwhile, had brought a counterclaim against Trudi, naming Murray as a codefendant, alleging conspiracy and abuse of process. During the course of the litigation, the trustees paid $418,759 in legal and related fees from the trusts,[31] all of which was included in the amounts surcharged in the final judgment.

In the years between the sale of the trust shares to the hospital and the trial, the hospital foundered. In 1989 it closed its doors and fell into bankruptcy. The trusts had then been paid, in addition to the cash payment at closing, $1,500,000, and the $500,000 on the five-month note, thirty-three or thirty-four monthly installments of $13,200 on the ten-year note, totaling either $436,260 or $449,480. The trustees had bought out a small first mortgage position and become mortgagees in possession of the hospital real estate. Before they were removed as trustees in 1991, Gabovitch and Woodrow had sought permis-

[30]Counsel for the trustees claimed at trial that the plaintiffs had expended between $700,000 and $1 million in litigating the case up to that point, some of which would be attributable to Trudi's claims against Richman and Henry. We do not know the total expended by the trustees, but the $419,000, roughly, that they were surcharged included legal and related fees only up to March, 1990, more than one year prior to the trial.

[31]In the summer of 1988, the trustees had apparently paid slightly over $200,000 from the trusts for legal and related fees. Trudi obtained a preliminary injunction barring the trustees from paying any further sums from the trusts for their benefit, directly or indirectly. The order was modified in February, 1989, to permit the trustees to pay $25,000 from trust funds to be applied to bills from their trial counsel. The case was scheduled for trial on March 15, 1990, but on March 6, 1990, due to a clerical mistake on the part of the court, the action was dismissed. Two days later the court allowed Trudi's motion to reinstate the action, but in the meantime the trustees had taken advantage of the dismissal to pay their trial counsel an additional $167,059.36 from trust funds. On April 19, 1991, during the course of the trial, the judge ordered that that sum and three smaller amounts the trustees had also paid out during the brief period the dismissal order was in effect be paid into court pending judgment. These amounts, totalling $193,486.48, were paid into court immediately thereafter. The escrow fund thus established, plus $225,273 that the trustees had paid from the trusts in counsel and accounting fees between the beginning of the lawsuit and the end of 1989, were all included in the total surcharged to the trustees in the final judgment.

sion of the trial court to sell the real estate for $1.2 million, an amount that presumably would have paid off the balance due on the $3 million purchase. Their petition, however, had been opposed by the Shear family and had been denied by the trial judge.[32] As of December, 1996,[33] the hospital real estate was still owned by the interim successor trustees, i.e., those appointed by the trial court, as mortgagees in possession.

The amount of the surcharge applicable to trustee fees, $285,975, represented the difference between the fees that Gabovitch and Woodrow paid themselves for the period 1974 through 1986 — $293,175 — and the amount that the judge found to be fair compensation for their services during that period, or $7,200 (i.e., $3,600 apiece).

As to the $3,600 figure, the judge was justified in finding that, up to the period 1985-1986, when the sale was being negotiated and completed, Gabovitch's and Woodrow's services as trustees were perfunctory. Thereafter, the judge found that

> "the sale of the Trusts' Hospital shares was not carried out in good faith or in accordance with good fiduciary standards . . . and from its inception was not done in the best interest of the Trusts. In the court's view neither Woodrow [n]or Gabovitch are entitled to any fees legal, trustee or otherwise in that connection. Their arrogant and reckless treatment of the Trusts' interests during the so-called negotiations [34] and sale of the Trusts' Hospital share should not be rewarded."

---

[32]According to allegations in an action brought by Gabovitch against the Shears and the interim successor trustees in the Suffolk Probate Court charging the defendants with waste of trust assets, the trustees' intention had been to sell the hospital real estate to Lynn Community Health, Inc. The Shears opposed the sale in order to lease the building to PHC, Inc., which would open a clinic. PHC, Inc., was successor to American International Health Services, Inc., Bruce Shear's company. Bruce was said to be president and Murray to be a shareholder. The Probate Court action referred to was dismissed on the ground that Gabovitch, no longer a trustee, lacked standing. An appeal was heard by another panel of this court, which reversed and remanded with instructions to hold the case until it should be determined in this appeal whether the order removing Gabovitch as trustee should be affirmed or reversed.

[33]That was the date of a postargument conference between the attorneys for Trudi and Maurice Shear, Mr. Gabovitch acting pro se, and the panel.

[34]"[S]o-called negotiations" apparently referred to the judge's view that "[t]he so-called negotiations were, on analysis, no more than Woodrow and

In part 6, *supra*, we ruled that the findings impugning the good faith of the trustees constituted an unsupportable distortion of the evidence and were thus clearly erroneous. That basis for disallowing the fees cannot stand.

The judge had a separate and sound basis for disallowing the fees. As discussed earlier, the trustees computed them by applying a large Boston bank's corporate fiduciary fee schedule. The fees thus calculated were properly disallowed. Percentage measures of compensation employed by commercial trust companies are grounded in contract but, in the absence of agreement with the settlor or, conceivably, the beneficiaries, may not be employed by other fiduciaries. *Grimes* v. *Perkins Sch. for the Blind*, 22 Mass. App. Ct. 439, 443-444 (1986). "There 'is no rule of law and no principle of right by which such commissions are to be charged or allowed without regard to the rendition of actual services therefor.' " *Id.* at 443, quoting from *Blake* v. *Pegram*, 101 Mass. 592, 600 (1869). "A trustee is only entitled to payment for services actually performed on behalf of the trust." *Rutanen* v. *Ballard*, 424 Mass. at 735-736.

We see no injustice in allowing the $7,200 of fees allowed by the judge to stand, attributing it all to services the trustees rendered in connection with the sale. Absent discussion with the Shears, and in light of the fact that no question of fees was raised until after the breakdown in the trustees' relationship to the Shear family, the claim for fees was stale as to the earlier years. As to 1985 and 1986, no systematic reconstruction of services was ever prepared. As to Woodrow, doubtless complete disallowance of the $25,000 fee for legal service in connection with the sale was unjust, but, because his appeal was not prosecuted, and because the judgment does not surcharge Gabovitch for Woodrow's legal fee, the matter is not before us.

As to Gabovitch, it is appropriate to consider that, for his services as accountant, not only to the hospital but also to the Shear family and the many Shear related companies, Gabovitch has been paid generously over many years. In general, each tax return and each annual preparation of financial statements generated a fee of $2,500, irrespective of labor expended. A striking example from 1986 was brought out at trial: that, at the time

Gabovitch talking to themselves and to principals at the Hospital whom Gabovitch manipulated or controlled." The finding that Gabovitch controlled Richman and Henry and that Gabovitch and Woodrow were thus talking to themselves had no substantial support in the record and was clearly erroneous.

Gabovitch effected the settlement of claims by American Medi-Labs against the hospital for $350,000, Gabovitch charged a fee of $2,400 to American Medi-Labs and one of $2,500 to the hospital. Gabovitch acknowledged being paid $70,000 in 1984 and $75,000 in 1986 for his firms accounting services to the hospital's ancillary and related companies. Gabovitch's services to the hospital and to the Shears were valuable, but, viewed as a whole, they have been well rewarded financially. This portion of the judgment may stand.

The judge gave two independent bases for ordering Gabovitch and Woodrow removed. The first, that they were in bad faith violation of their obligations as trustees is, as we have explained, not substantiated by the record. The second was that a relation of hostility existed between the trustees and the beneficiaries. The second basis is, in our judgment, supported by the record, and constitutes, on the facts of this case, a sound reason for removal.

The mere existence of hostility between beneficiaries and a trustee does not necessarily require removal of the trustee. *Shirk* v. *Walker*, 298 Mass. 251, 260 (1937). *Symmons* v. *O'Keefe*, 419 Mass. at 295. *Hardiman* v. *Hardiman*, 11 Mass. App. Ct. 626, 629 (1981). "There are many trusts in which no trustee could fully perform his duty without incurring the hostility of some of the beneficiaries." *Shirk* v. *Walker, supra. Edinburg* v. *Cavers*, 22 Mass. App. Ct. at 227. Nevertheless, hostility can be a ground for removal, even where the trustee is without fault. *Shirk* v. *Walker, supra.* The question of removal is addressed to the discretion and sound judgment of the judge. *Cooney* v. *Montana*, 347 Mass. 29, 38 (1964). *Hardiman* v. *Hardiman, supra.*

When the hostility arose was disputed. Trudi testified that she lost all faith and confidence in the trustees when they closed the hospital sale without clearing the final terms with the Shear family. Woodrow testified that Murray and Trudi were initially happy with the sale and congratulated him and Gabovitch for their success. In Woodrow's version, rejected by the judge, the hostility arose when the Shears asked the trustees to resign so that Murray could be appointed in their place. In any event, by the time Trudi's action was filed in March, 1987, it is clear that hostilities had set in and were growing increasingly bitter. The trustees had by that time tapped the trusts for improperly based, exorbitant fees, and Trudi was returning uncashed $15,000

monthly checks that the trustees had begun remitting. In response to the Shears' unjustified attribution of disloyal and treacherous motives to the trustees, Gabovitch became increasingly heedless of besmirching the Shears' reputation. Whatever the origin, in other words, it is clear by now, after years of very costly litigation, that the parties' relationship is best characterized as vengeful.

It is appropriate to remove a trustee when hostile feelings threaten to interfere with the administration of the trust. See *Comstock* v. *Bowles*, 295 Mass. 250, 259-260 (1936); *Shirk* v. *Walker, supra*; *Symmons* v. *O'Keeffe*, 419 Mass. at 295; *Edinburg* v. *Cavers, supra*. This is such a case. Of particular importance in this regard is the fact that Trudi is not an income beneficiary, entitled to periodic payments of the trust income, but instead receives distributions only in the trustees' discretion. Compare *Wilson* v. *Wilson*, 145 Mass. 490, 493 (1888), in which distributions were also purely discretionary with the trustee. There, the court said: "[W]here the duty of a trustee is so delicate, where the hostility has arisen since the trust was created, and is attributable in part to the fault of the trustee, where the existence of the hostility would naturally pervert his feelings and judgment, it is competent for a justice to remove a trustee without further proof of misconduct, upon the ground that the removal appears essential to the interests of the beneficiary." That is the situation here. A trustee with almost plenary discretion over all distributions to a beneficiary cannot reasonably be expected to exercise his power with desirable perspective and detachment when his motives and integrity are constantly impugned by the beneficiary and the parties have been mired for years in a draining legal equivalent of total war. Prudence called for a change of trustees.[35]

8. *Payment of counsel fees from the trusts.* The trustees, as discussed earlier (see note 31 and related text, *supra*), paid $418,759 in counsel and other, litigation-related fees from the

---

[35]An order removing a trustee at the instance of a life beneficiary in a proceeding to which the remainder beneficiaries, the Shears' sons, were not parties gave us pause. (Neither Trudi nor Gabovitch has raised the point.) Two factors persuade us that removal was proper here: first, the interests of the remainderman will be theoretically protected in the hands of court-appointed successor trustees; and, second, each of the Shear sons knew of this action (they were all deposed) but elected not to intervene. It is difficult to come away from reading the record in this case without being persuaded that the Shear family are cohesive in financial matters.

trusts, $193,486.48 of which the judge ordered held in escrow pending the outcome of the suit.[36] In the final judgment the judge surcharged the trustees for all such fees paid from the trusts. The record does not disclose the total amount of counsel and related fees the trustees paid for their defense. It stands to reason, however, that the sum far exceeds the $418,759 that they paid from the trusts, because that amount took into account only those fees incurred through March, 1990, more than one year prior to trial.

The outcome of the litigation has been mixed. Trudi Shear has succeeded in winning the removal of Gabovitch and Woodrow as trustees and in recovering the bulk of the extravagant trustee fees that they voted themselves improperly.[37] The trustees, however, have been successful in defending against the two principal claims, for restoration of lost dividends and for disposing of the hospital shares for less than fair value, both based on what we have held were unfounded claims of breach of fiduciary duty.

In general, a trustee is entitled to look to the trust for reimbursement of funds he reasonably expends in defending against charges of maladministration brought against him without fault on his part, *Gordon* v. *Guernsey*, 316 Mass. 106, 110 (1944), and "complete success on the merits is not a prerequisite to the recovery of fees and expenses." *Chase* v. *Pevear*, 383 Mass. 350, 373-374 (1981), citing *Crowell* v. *Styler*, 314 Mass. 122, 125 (1943). It is not unusual, therefore, to apportion a part of the counsel fees to claims on which the trustee succeeded in defending his proper administration of the trust, permitting that part to be paid from the trust, while requiring the trustee otherwise to cover his own counsel fees. *Gordon* v. *Guernsey*, *supra* at 110-111. *Chase* v. *Pevear*, *supra* at 373-374.

The usual practice, where such an apportionment is to be made as a result of modifications of a judgment on appeal, is to return the case to the trial court to receive evidence bearing on

[36]The $193,486.48 was the amount the trustees had ordered paid out for fees then due on March 7, 1990, in violation of a prior order barring such expenditures from the trusts. See note 31, *supra*.

[37]Trudi and Murray have also been successful in defending against counterclaims brought by Gabovitch and Woodrow for civil conspiracy and abuse of process. The judge ordered dismissal of the counterclaims after trial for failure, in his view, of the trustees to sustain their burden of proof. We see no reason to disturb that disposition.

allocating total attorney time and expense among the issues on appeal. We prefer not to do that in the present case, where we think that rough justice can be done without further hearings. The litigation has been extraordinarily extended already, and the parties are, if we sense the situation correctly, quite prepared to turn what should be a relatively perfunctory exposition of hours and billing rates into major ancillary litigation. See *Robbins* v. *Robbins,* 19 Mass. App. Ct. 538, 544 (1985). Moreover, apportionment of hours alone will not necessarily end the dispute. Major questions of line-drawing will attend such questions as the necessity for portions of the massive discovery that was attempted here, as well as the justification for the massive resistance to discovery in the form of claims of privilege asserted by all members of the Shear family. The matter of apportioning counsel fees, and deciding what portion may be paid from the trusts, is highly discretionary in any event.

In this case, taking all these factors into account, and particularly taking into account that the sums paid from the trusts, including those held in escrow, obviously represent only a portion — quite possibly the smaller portion — of the total expenses incurred by the trustees in defending their actions, we order that the $418,759 paid by the trustees from the trusts (which, again, includes the $193,483.48 they repaid into the court-held escrow account[38] ) be allocated to the issues on which the trustees prevailed, and not be surcharged to the trustees. The trustees will bear the fees and expenses that they did not pay from the trusts.

9. *Conclusion.* The judgment is vacated as to count I, and judgment is to be entered for the trustees on that count. The judgment on count XI, surcharging the trustees $260,975, jointly and severally, for trustee fees and separately surcharging Woodrow $25,000 for counsel fees is affirmed. The portions of the judgment removing the trustees and ordering accounts to be filed to the date of removal, having, we understand, already been executed, are affirmed. The judgment is amended by adding a provision to the effect that the sums that were removed

[38]The later docket entries indicate that on January 31, 1994, shortly before the entry of the appeal in this court, successor trustees filed a motion for release of the funds in the escrow account to the trusts, and the trial judge allowed the motion. The sum withdrawn from the escrow account at trial time — presumably $193,486.48 plus accumulated interest — is to be offset against the sum of $260,975, ordered repaid to the trusts by the judgment on count XI.

from the escrow account pursuant to the order on the motion of January 31, 1994, are to be credited against the $260,975 surcharged to Gabovitch and Woodrow, jointly and severally, by the judgment on count XI. The separate judgment of dismissal entered on the counterclaims filed by Gabovitch and Woodrow is affirmed. The costs of the preparation of the record on appeal are to be shared equally by the parties, with Trudi's share to be credited against the said $260,975 surcharge. Beyond that, no costs of appeal are to be awarded to any party.

*So ordered.*