van Gestel, J.
This matter is before the Court[4] on remand for further proceedings consistent with the opinion of the Appeals Court in Steele v. Kelley, 46 Mass.App.Ct. 712 (1999) (hereafter “Steele”), The second amended complaint, upon which this case was retried, contained six counts. On August 8, 1999, this Court dismissed Count V claiming relief under G.L.c. 93A. See Steele at 726. Thus, the retrial went forward only on Counts I, II III, IV and VI.[5] Also, consistent with the preference noted in Steele at 725-26, this Court- exercised its discretion and tried the case without a jury. Still further, the Court has requested designation as a Land Court judge for purposes of this case by order of the Chief Justice of Administration and Management under G.L.c. 211B, sec. 9(xxi). See Steele at 725.
Trial of a cross claim by The K’s, Inc. has been deferred until after the final resolution of the principal claims retried here.
*623 The second amended complaint brings claims against Gerald F. Kelley (“Kelley”), both individually and as trustee of the Chatham’s Corner Trust (“CCT”), by Walter E. Steele (“Steele”), a beneficiary thereof. Count I seeks an accounting. Count II asks that a certain mortgage and the assignments of certain rents to Kelley be rescinded. Count III prays for the termination of the CCT and a distribution of its accounts to the beneficiaries. Count IV is directed at a leasehold agreement between the CCT and The K’s, Inc., seeking the nullification thereof. Count VI asks for the removal of Kelley as trustee of the CCT.
The tangled procedural background that leads to this retrial is set forth in Steele at pp. 713-17 and need not be recited in detail here.
FINDINGS OF FACT
The Court begins its findings of fact with a description of the dominant instrument in this case, the Chatham’s Corner Trust. The CCT was executed on February 20, 1979. It describes Kelley as the settler and names him as its sole trustee. There was evidence in prior litigation[6] that the CCT was drafted by attorney Patrick Murphy (“Patrick”), about whom more will appear below. Kelley, himself, also is an attorney.
The CCT’s initial schedule of beneficiaries and their respective interests are listed as follows: 50% — Corey Washington Egremont Nominee Trust,[7] Walter E. Steele, Trustee; 25% — Gerald F. Kelley, Individually; and 25% — Walter E. Steele, Individually.
The originally named successor trustee in the CCT was a brother of Patrick, PaulM. Murphy of Brookline. By a declaration of amendment dated September 30, 1980, Paul M. Murphy was removed as successor trustee, and Thomas M. Finneran, then of Dorchester, was appointed as the successor trustee. No evidence indicating any other amendments to the CCT was presented, nor was any challenge to this amendment shown to have been made.
By a judgment rendered on October 28, 1992, in the case captioned Murphy v. Kelley,[8] Suffolk Superior Court #56546, a judge of the Land Court, sitting by special appointment, confirmed Kelley’s title to certain property as CCT trustee and found the beneficiaries of the CCT and their percentage interests to be: 20%— Kelley; 20% — Steele; 20% — Kathleen Meskell; and 40% — certain members of the Murphy family as designated in the CWEN trust. There having been no appeal from the decision in Murphy v. Kelley, it therefore is binding on all of the parties involved therein.
Certain parts of the CCT are significant to the rulings of law that follow and, therefore, are recited here among the findings of fact.
The CCT is to “endure for the term of twenty-one (21) years after the death of any life in being named or referred to (t)herein, unless sooner terminated as [t]hereinafter provided.” (par. 2).
The purpose of [the CCT] is to deal in and with, buy, purchase, own, acquire, hold, exchange, convey, sell, lease, sub-lease, rent, mortgage, pledge, encumber, hypothecate, survey, improve, divide, sub-divide, plant, develop, build, construct, alter, remodel, establish, operate, conduct, maintain, and/or otherwise dispose of either as principal, agent or broker, land and real estate of every kind, nature and description and all kinds of personal or mixed property including, without limiting the foregoing, buildings, machinery, boats, chattel mortgage[s], real mortgages, negotiable and non-negotiable instruments, securities, choses in action and other obligations, [and] to do and perform all things needful and lawful for carrying out the same.
(Par. 4.)
The trustee shall have legal title to the trust property and the trust funds. He shall have absolute power, control, management, and disposition thereof and shall likewise have absolute control and management of all business of the trust . . .
(Par. 5A.)
The trustee shall hold all trust property and trust funds, ... in trust for the purposes!,] with the powers and subject to the limitations [t]herein for the benefit of. . . the beneficiaries and it is [t]hereby expressly declared that a trust and not a partnership is [t]hereby created . . .
(Par. 6.)
Among the many broad powers granted to the trustee are powers permitting him “to convey, transfer, sell in whole or in part at public or private sale, with or without consideration, to donate, to give away, to contract or agree for the acquisition, disposal or encumbrances of the same or any property whatsoever and wheresoever located” (par. 7A(d)), and “generally to do all things in relation to the trust ‘res’ as if the trustee was the absolute owner of the trust ‘res’ and [the] trust had never been executed.” (Par. 7A(n).)
All “decisions made by the trustee in good faith shall be conclusive on all the parties at interest.” (Par. 7B.) Nor shall “the exercise of any powers [in the trust]. . . require the approval of any court.” (Par. 7C.)
In dealing with the trust “res” and the management thereof, the trustee shall not be held to the usual standard of care for trustees but only [sic] to the standard of care of ordinary individuals dealing with their own property and having due regard to reasonable business and speculative changes with the ultimate view of a general increase by means of frequent or otherwise turnings of conversions and his judgment shall not be subject to review.
(Par. 8A.)
The trustee shall not be liable for any error of judgment!,] of mistake of law, or for any loss arising *624 out of any investment or for any act or omission in the execution of [the] trust, so long as he act[s] in good faith, nor shall [h]e be personally liable for the acts or omissions of any agent or attorney appointed by or acting for him; the trustee shall not be liable for anything except his own personal and willful misfeasance or fraud.
(Par. 8B.)
. . . [T]he trustee shall be entitled to indemni[t]y against any and all liabilities either in contract or tort which he may incur or [to] which he may be subject, out of the trust “res.”
(Par. 9.)
The trustee shall receive reasonable compensation for his services [t]hereunder as determined by the trustee’s discretion.
(Par. 10.)
The interest of the beneficiaries [t]hereunder, either as to income, interest or principal shall not be anticipated, alienated or in any other manner assigned by such beneficiaries and shall not be subject to any legal or equitable process, bankruptcy proceedings, or the attachments, interferences, or control by or of creditors or others.
(Par. 11.)
. . . [T]he beneficiaries shall have no right to call for any partition or distribution during the continuance of [the] trust, and the sole right, claim, and interest of the beneficiaries shall be in the obligation of the trustee to hold, manage, apply, and dispose of the trust “res” and account for the income and proceeds thereof in the manner provided for [t]herein.
(Par. 12.)
The trustee shall declare dividends from the net income o[r] profit of the trust “res” for the beneficiaries, annually] or oftener [sic], if convenient to the trustees, if the income and profits accumulated in the discretion of the trustee justify a dividend to be declared!,] and his decision as to the amount of dividends to be declared shall be final.
(Par. 13.)
The trustee may alter, amend or terminate [the] declaration of trust at any time and for any purpose
(Par. 17B.)
At the time of the execution of the CCT, Kelley, Steele and Patrick Murphy had been good friends for a number of years. Indeed, Kelley and Steele were boyhood chums. Perhaps as a result of their mutual experience in drinking establishments in the Boston area, Kelley and Patrick, in 1978, decided to try their hand at purchasing a building to be used as a bar and restaurant that would employ Patrick’s brother Paul, as well as several of Kelley’s children. Both Patrick and Kelley were to invest their own money in the venture.
It was then that Kelley and Patrick contacted John Meskell (“Meskell”), also then an attorney, and a person knowledgeable about the local real estate market for bars and restaurants. It was Meskell who located and negotiated the purchase of the site at the corner of Commercial and Chatham Streets, near the Quincy Market area in Boston.
He, too, was to put a small amount of money into the venture — perhaps $14,000 or $15,000.
The principal venturers, Kelley and Patrick, had some difficulty coming up with the $ 150,000 purchase price and therefore sought mortgage financing. This too was a problem because Kelley’s and Patrick’s credit ratings were weak. It was then that Steele joined the venture. He ended up guaranteeing the first $50,000 of a $150,000 mortgage from the Central Cooperative Bank. Steele never, however, put any money into the venture.
Steele, at the time in 1979, was a justice on the Massachusetts District Court. For that reason, and perhaps others, he had no desire to become involved in the ownership or operation of a restaurant/bar. He was, however, interested in becoming a part-owner of the real estate.
Despite the fact that the four venturers consisted of three lawyers and a judge, they never committed their arrangement to writing.
In mid-1978 there was a closing on the purchase of the real estate at the intersection of Commercial and Chatham Streets (the “site”). At the time of the closing, title, for temporary convenience, was taken in the name of the CWEN trust. Steele was then that trust’s trustee. The CWEN trust was a Massachusetts nominee trust used by the Murphy family in connection with real estate transactions, mostly in the Brighton section of Boston. Patrick contributed $46,000, and Kelley, $4,000 toward the purchase price of the site. The balance came from the Central Cooperative Bank mortgage loan, $50,000 of which was guaranteed by Steele.
On February 20, 1979, Kelley and Patrick together drove to Steele’s lobby at the Wareham District Court. They had with them the newly drafted CCT and an unsigned deed of the site from the CWEN trust to the CCT. The purpose for the visit was to show the CCT to Steele and obtain his signature on the schedule of beneficiaries. Steele didn’t really examine the CCT in any detail. In fact, he had essentially no experience, either as a lawyer or a judge, - in the drafting of or dealing with trusts. Steele did ask Patrick, however, whether he was satisfied with the trust and received an affirmative answer.
Also on February 20, 1979, Steele, in his capacity as trustee of the CWEN trust, signed over to the newly executed CCT the deed to the site. Kelley and Patrick returned to Boston, and Patrick held onto both instruments for a couple of weeks.
*625 On March 8, 1979, the deed to the site from CWEN trust to CCT and the CCT itself were duly recorded in the Suffolk Registry District of the Land Court. The site is registered land.
Prior to the execution of the CCT, in the fall and early winter of 1978, Kelley, members ofhis family and friends all worked, along with Meskell and others, on the effort to physically make the site ready for operation as a restaurant/bar.
A corporation called Second State Street Corporation (“SSSC”) was formed to run the restaurant/bar. Kelley, Patrick and Meskell each had equal stock interests in that corporation, and some of them, or their spouses, held offices and were directors. Steele was not involved as a shareholder, officer or director of this corporation because of his wish not to be involved in the operation of the restaurant/bar. Initially, Kelley was the president of SSSC. Paul Murphy and members of the Kelley family worked at the restaurant/bar when it first opened in the spring of 1979. SSSC began operation under a lease from CCT at a rental of $1,874 per month, plus 6% of the lessee’s gross sales in excess of $400,000.
It was not long — perhaps a little over a year — before there arose disagreements, unexplained in this retrial, between Kelley and the Murphys, particularly Patrick, over the operation of the restaurant. Those disagreements resulted in Kelley abruptly being ousted from his position as president of SSSC and later, in August of 1982, led to litigation being instituted on behalf of several of the Murphys, claiming to be beneficiaries of the CWEN trust, against Kelley, Steele and Meskell. The essence of the case, called Murphy v. Kelley,[9] was an effort, by voiding the conveyance of 1979, of the Murphy interests to wrest from CCT control and ownership of the site where SSSC operated the restaurant/bar. Damages were also sought against Kelley personally.
Murphy v. Kelley was hard-fought and engendered permanent rifts between many of the participants. It lasted in the trial court for ten years before its determination, in Kelley’s favor, at least in significant part,[10] in October of 1992. During essentially all of the decade-long litigation, a court-appointed receiver was in place at the CCT. Kelley, although never removed as trustee, was kept out of the day-to-day operation thereof.
For reasons not wholly explained at the retrial of this case, the receiver during the 1982-1992 period declined to pay for the defense of the CCT in the litigation; nor did the court direct him to do so despite the persistent requests therefor by Kelley. As a result, Kelley assumed that heavy burden, initially acting as counsel himself, and later by engaging, and paying out of his own funds as long as they lasted, outside counsel. Additionally, Kelley spent hundreds, perhaps thousands, of hours working on all aspects of the defense of the case. When it finally went to trial, the case consumed 65 trial days spread sporadically over a two-year period. Kelley was present on nearly all of those days. Indeed, he was on the witness stand for 15 days.
As noted above at p. 3, the judge in Murphy v. Kelley confirmed title to the site in the CCT and Kelley as its trustee, and declared the beneficial interests in the CCT to be 20% each for Kelley, Steele, and Kathleen Meskell, and 40% in the Murphy brothers or their legal representatives.
Shortly before the discharge of the CCT receiver in 1992, the court in Murphy v. Kelley approved a new lease, negotiated by the receiver for CCT with SSSC, for the operation of the restaurant/bar at a monthly rental of $4,608. In November 1992, however, SSSC abruptly vacated the premises, owing CCT $40,000 to $50,000 in rent. Further, SSSC stripped the site of all of its fixtures, including the bar, sinks, toilets and all of the equipment necessary to operate. The premises, all agree, were a shambles. Shortly thereafter SSSC filed for bankruptcy, and neither the back rent nor damages for the condition of the site when abandoned were recovered by CCT.
It is the actions of Kelley in 1992 and thereafter, then free of a receiver for the first time in 10 years, upon his resumption of control of the site and the CCT that led to this case.
During the period between the resumption of his active trusteeship (fall of 1992) and the commencement of this suit (June 1994), Kelley as trustee of the CCT did the following: he calculated that the CCT owed him $290,000 for his past services as trustee, for attorneys fees for his own legal services to the CCT and those he personally paid to the CCT’s law firm in Murphy v. Kelley, as well as for all unreimbursed monies he had personally advanced to the venture at the time of its inception. Kelley described the various elements that made up the $290,000 as follows: $39,549.25 that he paid personally to Nathanson & Goldberg, CCT’s counsel in Murphy v. Kelley; $45,000 in attorneys fees for his own legal services contributed to the CCT during Murphy v. Kelley, at a time when the then-receiver declined to pay for the defense of the case; $ 105,000 as trustee’s fees for a period of 14 years at $7,500 per year; approximately $38,549 advanced to the enterprise; and $61,500, which Kelley calculated as interest due on some of the foregoing amounts. Kelley’s numbers do not quite add up to $290,000. They fall short by $401.75, a relative pittance in the overall economic picture.
In January 1993, Kelley, as trustee of the CCT, paid himself personally from the CCT $65,000 against the $290,000 he claimed was his due, leaving a balance, by his figures, of $225,000.
On March 30, 1993, Kelley as trustee of the CCT executed a Mortgage and Security Agreement running in favor of himself personally, thereby securing the *626 payment of the $225,000 balance he claims is due from the CCT. The mortgage encumbered the CCT property at Chatham’s Corner. On the same day, Kelley as trustee of the CCT executed an Assignment of Leases and Rents, running to himself personally, as additional security for the claimed $225,000 indebtedness to him from the CCT. The rents so assigned were those rents from the various leases between the CCT and its tenants at Chatham’s Corner.
At about the same time, Kelley as trustee of the CCT entered into a lease of the restaurant/bar premises with The K’s, Inc. — described in the lease as “The K’s Corporation” — the corporation controlled by his daughters. The term of this lease ran from April 1, 1993 to March 31, 1998, with an option for the lessee to extend for an additional five years to March 31, 2003. The rent for the initial term was $4,600 per month. The rent for the five-year option period is set at the lesser of the then-market rent, or $62,400 per year.
Steele and Kathleen Meskell, being concerned about Kelley’s management of the CCT, each demanded accountings, and each demanded distributions from the CCT to the beneficiaries. Neither was forthcoming, although the evidence presented during the first trial of this case, resubmitted with additions in this second trial as Exhibits 10, 11, 15, 16, 16A, 16B, 17, 40, 41 and 42, among others, might well satisfy the accounting requirements. This litigation followed shortly after the demands and their refusals.
Taking them in the order recited above, the Court now expands upon its findings on each of the elements that make up Kelley’s claims and Steele’s concerns regarding them.
As stated, Kelley paid $39,549.25 to the law firm of Nathanson & Goldberg (“N&G”) for its representation in the defense of Murphy v. Kelley. There is no question but that N&G earned its fees. Clearly, without its efforts in the decade-long litigation, there would be no CCT, or at least no CCT with the valuable and income-producing trust corpus of the property at the corner of Commercial and Chatham Streets. The court in Murphy v. Kelley authorized payment to N&G from the CCT of $161,360. The fees charged were $200,910. It is the balance of $39,459.25 paid by Kelley that is now in contention. Despite Steele’s argument that since Kelley was a defendant personally in Murphy v. Kelley, as well as in his capacity as trustee of the CCT, at least some of that fee should not be charged to the trust, this Court finds the repayment to Kelley from the CCT of this additional amount to be an appropriate exercise of the discretion granted by the trust. It is not possible to segregate the amount of N&G’s fees and expenses solely limited to its representation of Kelley individually, particularly because the real basis for the Murphys’ claims was directed at the CCT itself.
Kelley’s $45,000 in attorneys fees present a more complex problem. During the full period of the litigation of Murphy v. Kelley, Kelley was otherwise fully employed and, inferentially at least, fully paid as an attorney in the employ of the City of Boston. At the same time, as previously noted above, the receiver for the CCT declined to pay for the defense of the lawsuit. This put a great strain on Kelley in compensating N&G. There were, in fact, times when N&G attempted to resign as counsel because it was not being paid for its efforts. Kelley, understandably, being an attorney also, solved some of the defense-cost problems by performing the work himself; and this work was substantial. While the actual number of hours employed by Kelley is not known, his suggestion that the $45,000 represents charges of only $25 per hour, thereby implying about 1,800 hours over a ten-year period, is far from out of line. The more significant issue, discussed below in the rulings section, is not so much the amount as whether Kelley as trustee should be permitted to act and be compensated as the trust’s counsel.
Kelley never took a fee as a trustee prior to the Murphy litigation, and the receiver paid him none during that period. While his charge of $7,500 per year for that work is somewhat arbitrary, it does not strike this Court as out of line for the nature of the work he was required to do during that period in order to administer and protect the trust. New would be willing to do what Kelley did during the time of the Murphy litigation, or before in the start-up period, for less. Given the broad discretion in the CCT, this Court finds the trustee’s fees charged by Kelley to be acceptable.
Kelley is also claiming reimbursement for some $38,549 that he says he invested in the enterprise at the time of its inception. The evidence presented to support these payments was scanty and, quite frankly, hard to justify in many instances. Additionally, a significant portion of this money was “invested” before the CCT was created. It is difficult to see how any monies spent before February 20, 1979, the date the CCT was executed — or perhaps even later in March 1979 when the trust was funded by the transfer of the property in issue to Kelley as trustee of the CCT — can properly be charged to it. Nor, it seems to this Court, ought any of those initial monies paid out by Kelley, and possibly others of the venturers, be fairly charged to the trust, as opposed to the enterprise itself, whatever the latter may be.
A significant amount of Kelley’s claimed charges is made up of $61,500 of “interest.” The issue of whether a trustee in Kelley’s position should be charging interest on payments belatedly made from the trust, some being reimbursements for contributions to the enterprise, will be addressed below in the rulings section.
The mortgage and the assignment of rents are challenged not for their terms or conditions but rather for their propriety and for the interrelated issues about whether the amounts they secure are proper. All will be discussed further below in the rulings section.
*627 The lease to The K’s, Inc. warrants some comment and certain significant findings. Steele charges that certain conditions of the lease are favorable to the tenant and, that the rent may be too low, thus prompting him to call it a “sweetheart deal.” Significantly, however, the lease to The K’s, Inc. is not much different from that of the lease to the predecessor SSSC, about which none of the beneficiaries, including Steele, protested. In fact, the investment in renovations of the site by The K’s, Inc. — estimated to be valued at $150,000 — in contrast to that of SSSC becomes the property of the CCT upon the lease’s termination.
As for the rent of $4,600, it is not only essentially the same as that approved to be paid by SSSC under its new lease in 1992, but also it was found to be higher than the fair rental value for the property by an independent real estate appraiser engaged by the second receiver and, as such, also was approved by the court in September 1996.
Given that the original objective of the enterprise was to operate a restaurant/bar that employed members of the Murphy and Kelley families, and the approval by the court in 1996 of the rent under The K’s, Inc. lease, this Court finds no fault with any aspect of that lease or the execution thereof by Kelley as trustee of the CCT. The evidence was clear that Kelley, himself, has had nothing whatsoever to do with the day-to-day operation of The K’s, Inc., nor was he ever a shareholder, director, officer or employee thereof.
During Kelley’s unfettered tenure as trustee of the CCT from November 1992 until the filing of this suit in June 1994, he is charged by Steele with two other things that are claimed to be in breach of his duty of loyalty as a trustee and mismanagement of the trust. One Kelley excuses, and the other he denies.
The first breach is Kelley’s failure to make timely payments of real estate taxes to the City of Boston. He proffers the excuse that it was better to pay the mortgage and other debts than to pay the taxes instead, thereby concealing from the bank and creditors any economic weakness in the enterprise. The failure to pay taxes in a timely fashion, however, resulted in liens being filed and penalties being imposed, all to the detriment of the trust.
The second group of charges was that Kelley attempted, in a heavy-handed way, and contrary to express provisions of the CCT, to acquire Kathleen Meskell’s and the Murphys’ beneficial interests in the CCT. Both efforts, the witnesses reporting them contended, were rebuffed. Kelley denies that either attempt was ever made.
There is no question but that there is deep hostility between the beneficiaries and Kelley at this time, and there has been since 1982 and before. That hostility has been engendered by the Murphy lawsuit, as well as by Kelley’s own actions in its wake. It also, however, is in part a product of the beneficiaries’ almost total lack of appreciation of the breadth of discretion given to the trustee under the CCT trust indenture — a stunning fact given the plethora of legally trained persons involved.
RULINGS OF LAW
The Court begins its rulings with the statement of some general principles that govern a trust such as the CCT.
A trust is a fiduciary relationship in which one person is the holder of the title to property, subject to an equitable obligation to keep or use the properly for the benefit of another. It is an obligation imposed, whereby the obligor is bound to deal with property over which he has control for the benefit of certain persons, of whom he himself may be one, Mahoney v. Board of Trustees, Boston Shipping Ass’n, 973 F.2d 968 (1st Cir. 1992), and any of whom may enforce the obligation. In its simplest sense, a trust is a confidence reposed in one person for the benefit of another with respect to properly held by the former for the benefit of the latter.
A significant factor in assessing the actions of a trustee relates to the exercise of his most fundamental obligation to the beneficiaries, his duty of loyalty to the trust. That duty of loyalty is undivided. The trustee is not permitted to place himself in a position where it would be for his own benefit to violate his duty of loyalty. The duty finds its origin not in the trust instrument itself but rather from the basic concepts and principles of the trust relationship. Boston Safe Deposit & Trust Co. v. Lewis, 317 Mass. 137, 140 (1944).
By the provisions of the trust instrument, however, a trustee may be permitted to do what in the absence of such a provision would be in violation of his duty of loyalty. Id. at 141.
A trustee must use his best informed judgment in good faith in light of what established rules suggest to the trustee is consistent therewith. Fine v. Cohen, 35 Mass.App.Ct. 610, 617 (1993).
A trustee holds property subject to the duties of a trustee. Those duties are found in the trust instrument and in the law of trusts that has evolved in the interpretation and enforcement of those instruments. Thus, here this Court must measure “Kelley’s discretionary acts as trustee vis-a-vis Steele (and the other beneficiaries testifying in his behalf) against the appropriate standards of duty and performance under [the CCT] instrument, in light of the settlor’s expressed intentions, the scope of the trustee’s powers and the circumstances attending the creation of the [CCT], as well as under generally applicable trust principles.” Steele at 727.
“The interpretation of a written trust is a matter of law to be resolved by the court ... A trust should be construed ‘to give effect to the intention of the settlor as ascertained from the language of the whole instru *628 ment considered in the light of the attendant circumstances.’ ” Schroeder v. Danielson, 37 Mass.App.Ct. 450, 453 (1994).
A Court generally is not free to substitute its own judgment for that of the trustee as to what was wise or better, and it only may intervene in those relatively rare occasions when it is necessary to prevent an abuse of discretion. State Street Bank & Trust Co v. Reiser, 7 Mass.App.Ct. 633, 635 (1979). “The judgment of the court cannot be substituted for the discretion of the constituted authorities, when fairly exercised, even though the court may think the decision wrong.” Roy v. Bacon, 325 Mass. 106, 408 (1943).
Under the provisions of the CCT, the trustee has the authority to act for the trust on all matters without any direction, consent, or approval by the beneficiaries, and the trustee is entitled to control the trust res and its disposition without any direction from the beneficiaries.
The identity of the settlor of the CCT is not readily apparent. The settlor, of course, is the person who intentionally causes the trust to come into existence. To ascertain the settlor’s intent, the Court must look to the trust instrument as a whole and the circumstances known to the settlor on its execution. Pond v. Pond, 424 Mass. 894, 897 (1997). Of course, the CCT designates Kelley as the settlor. Despite that fact, the persons most deeply involved in causing the CCT to come into existence seem to be Patrick Murphy as well as Kelley, with some assistance from Steele himself. Patrick, or someone in his law office, was the draftsman of the instrument: Kelley was the named trustee and a beneficiary; and Steele, as trustee of the CWEN nominee trust, conveyed the property to Kelley as trustee that became the CCT res. There can be no trust unless there is an existing trust res. New England Trust Co. v. Sanger, 337 Mass. 342, 348 (1958).
The circumstances attending at the creation of the CCT are much more clear than the true identity of the settlor. The premises at Commercial and Chatham Streets were “originally purchased for use as a restaurant and bar operated by or employing, among others, several members of Kelley’s family, with the res of the trust (the whole purpose of which was stated to be, inter alia, ‘to deal in and with . . . real estate’) consisting of the premises and the principal trust activity the leasing of the premises to another corporation which would operate the restaurant and bar.” Steele at 730.
With the foregoing preliminary remarks in mind, and with a full awareness of the teachings for this case in particular contained in Steele v. Kelley, 46 Mass.App.Ct. 712 (1999), the Court now will assess and rule on the claims of each of the counts of Steele’s second amended complaint that remain for determination. [11]
Count I — Accounting
The first count prays that the Court order Kelley to account to the beneficiaries for all actions taken by him since he became trustee of the CCT. Generally, a trustee must account for trust property held by him and can be compelled to do so by a beneficiary. Even where the trust instrument purports to relieve the trustee from the duty to account, he will, nevertheless, in a suit for an accounting, be required to show that he faithfully performed his duties. Briggs v. Crowley, 352 Mass. 194, 199-200 (1967).
The CCT does not state when Kelley must account for his actions, nor does it excuse him from the duty to account. It does, however, impose on him to make all decisions and exercises of power “in good faith.”
Kelley’s tenure as the trustee of the CCT was out of the ordinary. From 1982 to 1992, during the Murphy litigation, although Kelley was never removed as trustee, there was in place at all times a court-appointed receiver. It was the receiver, not Kelley, who conducted the day-to-day operation of the trust, reporting to the court and acting under its supervision. Kelley’s role was focused principally, but not exclusively, on defending the trust in court against the Murphys’ charges. The decision favorable to the CCT in Murphy v. Kelley, and the receiver’s reports to the court, is accounting enough for Kelley’s activities during the decade from 1982 through November 1992.
Similarly, yet another receiver was appointed by the court at the conclusion of the first trial of this case on April 18, 1996. That receiver has been retamed in place by this Court, at least until the conclusion of this second trial. Once again, the receiver is acting under the supervision of the Court, reports to the Court on a regular basis and obtains Court approval for his activities in running the day-to-day operations of the CCT, all with full notice to the beneficiaries. This is sufficient accounting for the period from April 18, 1996 to date.
Thus, the only time period remaining to be accounted for regarding Kelley’s actions as trustee of the CCT is that from November 1992 to mid-April 1996. While no separate accounting has been made by Kelley, there were produced in evidence at the first trial, and again with further supplementation at this second trial, from the trust’s accountant — who has been in the position throughout, under Kelley and under both receiverships, without complaint — the following records: the CCT financial reports and accountant’s work papers for the years ended 12/31/92, 12/31/93, 12/31/94, 12/31/95 and 12/31/96; a statement of payments from the CCT to Kelley for the year ended 12/31/93; and an accountant’s accounting for the years 1992 through 1996. To this Court no point will be served, nor need it be, by compelling Kelley to further account. Such an accounting would, undoubtedly, be no more than a restatement of the documents already spread on the *629 record and amplified by Kelley’s testimony on both direct and cross-examination in two trials.
The accounting prayed for in Count I, given the special circumstances of this case, having been satisfied, that Count should be DISMISSED. By so doing, however, no party should take this ruling to be an endorsement by this Court of the kind of accounting that ought to occur by any CCT trustee in the future. A trustee must render an accounting at reasonable times when called upon to do so by the beneficiaries. Chopelas v. Chopelas, 303 Mass. 33, 34-5 (1939). This is particularly so when the extremely broad discretion given to the trustee in the trust instrument is being employed.
Count II — Voiding the Mortgage, and Assignment of Leases and Rents
The second count seeks to have the Court void the March 30, 1993 mortgage and lease and rent assignments from Kelley as trustee to Kelley individually. Under ordinary circumstances, the creation of these instruments would be considered the kind of self-dealing by a trustee that is wholly inconsistent with the duties of loyalty imposed by general trust law. See, e.g., Johnson v. Witkowski, 30 Mass.App.Ct. 697, 705-06 (1997).
Before reaching that conclusion here, however, the Court must examine the powers granted to this trustee by the language of the CCT. Notably, par. 5A of the CCT grants the trustee “absolute power, control, management, and disposition [of the trust property] and . . . likewise absolute control and management of all business of the trust ...” Par. 7A(n) permits him “generally to do all things in relation to the trust ‘res’ as if the trustee was the absolute owner of the trust ‘res’ and [the] trust had never been executed.” And most significantly, par. 8A recites that “[i]n dealing with the trust ‘res’ and the management thereof, the trustee shall not be held to the usual standard of care for trustees but [only] to that standard of care of ordinary individuals dealing with their own property and having due regard to reasonable business and speculative changes with the ultimate view of a general increase by means of frequent or otherwise turnings of conversions and his judgment shall not be subject to review.”
The only real constraint on any of the foregoing is the section in par. 7B mandating that all “decisions made by the trustee in good faith shall be conclusive on all parties in interest.” “In such a case, acts of a trustee challenged as improper self-dealing will be struck down by the courts only ‘upon clear proof that the trustees are abusing their authority and acting in perversion of the trust.’. . . [C]ourts will interfere with the conduct of a trustee with extraordinary discretion only ‘on those relatively rare occasions when it is necessary to prevent an abuse of [that] discretion.’ ” Steele at 735.
Thus, was the granting of the mortgage and the assignment of the leases and rents the kind of thing that the absolute owner of the properties would do if not constrained by general trust principles, and were Kelley’s decisions to do so made in good faith? “[W]ere [those acts] so arbitrary, capricious, dishonest, or fraudulent as to amount to an abuse of discretion that they should be prevented or corrected by a court of equity?” Steele at 736. Was Kelley’s “exercise of discretion in deciding to reimburse himself for those items [that made up his claim for $290,000] and determining their amounts ... so irrational or dishonest as to amount to an abuse of discretion?” Steele at 737.
While this Court questions some of the elements that make up the $290,000 claim — and discusses those elements below — it does not find fault, given the breadth of discretion provided in the CCT, with a significantly large amount as to warrant Kelley in providing security for its reimbursement by way of a mortgage. However, the Court views the assignment of the leases and rent payments quite differently.
As to the elements of Kelley’s claim for reimbursement that this Court finds appropriate, they are: the $39,549.25 he paid to Nathanson & Goldberg; the $45,000 in attorneys fees he charges for his own work in defending the Murphy claim; and the $105,000 as trustee’s fees for the 14years from 1979 through 1993.
Under the provisions of the CCT, the trustee had the power to defend suits or otherwise engage in litigation and “to employ counsel for any of the purposes [stated earlier in the trust] or [for] other purposes.” Par. 7(k) and (1). A trustee has a right of reimbursement from trust assets for any obligations properly incurred by him for the benefit of the trust, including the payment of counsel fees advanced by the trustee personally. Town of Hull v. Tong, 14 Mass.App.Ct. 710, 712 (1982). Similarly, a trustee is entitled to reimbursement for any proper expenditures, advances, or monies made or paid by him. Horton v. Richardson, 212 Mass. 248, 251 (1912). Kelley, by virtue of the fact that the trust’s receiver declined to pay for the defense of Murphy v. Kelley, was compelled to front the money himself or let the trust go defenseless. He cannot be faulted for his actions in this regard.
Nor is it improper, at least under the circumstances presented to Kelley in the Murphy litigation, to compensate himself for the legal services he provided. See, e.g., Shear v. Gabovitch, 43 Mass.App.Ct. 650, 687 (1997); Lembo v. Casaly, 5 Mass.App.Ct. 240, 244 (1977).
The CCT also mandates that the trustee “shall receive reasonable compensation for his services [t]hereunder as determined by the trustee’s discretion.” (Par. 10.) See Boston Safe Deposit v. Scott, 317 Mass. 768 (1945). Kelley was never removed as trustee when the receiver was appointed in 1982. Despite that receivership, Kelley performed significant services *630 that were not perfunctory — defending against a case that would have left the trust with no corpus. But because of that receivership, Kelley was not able to pay himself any trustee’s fees for 10 long years. Kelley’s services were in major part as counsel — for which he has been awarded by this Court $45,000 above — but also for the significant work as trustee in assisting outside counsel in the defense. There will be no duplication of compensation here. Nor, given the presence of the receiver, is this the kind of case in which the payments to Kelley of trustee’s fees in 1993 were stale and therefore should be barred. See, e.g., Shear v. Gabovitch at 687.
Given the nature of the efforts required during the pendancy of Murphy v. Kelley, and the broad discretion given by the CCT in their determination, trustee’s fees of $7,500 per year seem well within the bounds of propriety.
As stated in the findings of fact above, all things being considered, Kelley was neither irrational nor dishonest in believing himself entitled to and pursuing the amounts of these charges. These three items alone aggregate $189,549.25. Given the long history of antagonism toward Kelley by the Murphy family, the essential lack of support to him by the remaining beneficiaries and co-venturers during the decade of Murphy v. Kelley, and the persistent maneuvering in court by many of that group, it was again far from irrational, and certainly not dishonest for Kelley to protect his own interests by the device of a mortgage. The CCT granted him the power to do so.
On the other hand, this Court does not consider that it has enough evidence from Kelley, who as trustee must explain his actions, see, e.g., Samia v. Central Oil Co. of Worcester, 339 Mass. 101, 126 (1959); Chopelas v. Chopelas, 303 Mass. 33, 35 (1939), to accept his claim for $38,549 for monies advanced to the enterprise at its inception. As noted in the findings, many of the amounts were unexplained and expended before the CCT was even established and funded. Further, the CCT was not established to run the restaurant and bar; that was to be handled by a separate corporate entity that would lease the CCT premises for the purpose. There is nothing in the CCT instrument that even hints at any obligation from that trust to reimburse the original investors for their contribution to the enterprise.
Kelley argues that certain of the findings in the Murphy litigation are binding on all parties here and precluded them from challenge in this retrial. Kelley points to those findings by Judge Cauchon that establish what was to be the original venture, who was to contribute to it, and how the contributors were to be repaid. Those findings included determinations as to what was done and who was compensated for it.
The foregoing notwithstanding, Judge Cauchon’s findings did not make any reference as to from what entity the reimbursements were to come. Here, Kelley says they are due from the CCT. This Court disagrees, and rules that such recovery is due from the venture, not the CCT.[12]
The Court also has unanswered questions about Kelley’s awarding himself $61,500 in interest on the items for which he claims payment. Broad as it may be in providing discretion to the trustee, this Court finds nothing in the CCT to warrant the trustee, having failed to pay himself, or seek such payments from the receiver or a court, amounts due on a timely basis, to make up for the problem by adding interest to any payments later made. Thus, this Court will not exercise its equitable powers to approve any interest on amounts that remain due to Kelley.
Above, the Court approved of the mortgage as a security device for Kelley. Given the Court’s rulings regarding the items that may, and may not, be included in the claim, however, the mortgage and any supporting promissory note must be reformed to reflect the lesser amount approved[13] and any payments made thereon since their execution on March 30, 1993. Additionally, if the payments made to date exceed $189,549, the excess must be returned to the CCT.
Also, although the Court accepts a mortgage as appropriate security, it is unwilling to accept the assignment of the leases and rent payments for the same purpose. The leases and the rent generated thereby, aside from the value of the premises itself, constitute the heart of the trust res. Even given the wide powers of the CCT, if it is to exist at all as a trust, it cannot be equitable or fall within the duty of loyalty for a trustee to give to himself individually by such an assignment the entirety of the income produced and the vehicles that produce it. This is not holding “all trust property and trust funds, ... in trust for the purposes!,] with the powers and subject to the limitations [t]herein for the benefit of .. . the beneficiaries [thereby enabling it to be] expressly declared that a trust and not a partnership is [thereby] created.” (Emphasis added.) (Par. 6.)
For the reasons stated in this part of these rulings, Count II is DISMISSED, except to the extent that the trustee is ORDERED to take such steps as may be necessary to reform the mortgage and any promissory note in a manner consistent herewith, to recover any payments in excess of $189,549, and to discharge or dissolve the assignment of leases and rents.
Count III — Trust Termination
The third count asks for an order to Kelley to terminate the CCT and distribute the assets thereof to the beneficiaries.
The Court begins this portion of its rulings with a discussion of whether the CCT is in fact a trust. The Appeals Court, in footnote 11 of Steele at 720, after its own explication of the extraordinary powers granted the trustee of the CCT, points out that “[n]o issue was *631 ever raised below whether such unrestricted power was conferred upon the trustee by the trust instrument that no trust was created as a matter of law.” Despite the fact that the issue is wholly and solely a matter of law for decision by a court the Appeals Court was content to leave the matter dangling, presumably for this Court to resolve, at least in the first instance. Perhaps incorrectly, this Court credits the Appeals Court’s intention to have been to permit Steele to present some additional evidence or argument to warrant a ruling that there is no trust. If so, he did not.
To Start with, Steele’s complaint and the relief it seeks is predicated wholly upon his position and rights as a beneficiary of the CCT. Count III prays for the termination of the trust and a distribution of its assets to the beneficiaries. Steele is bound by his own pleadings. Indeed, his case would evaporate if there was no trust.[14]
Much more significantly, as set forth in Steele at 724-25, 729, the doctrine of issue preclusion bars Steele from seeking trust termination as relief. “Steele’s termination claim — in functional effect, another petition for ending the trust by partition and distribution of the trust property, since Steele neither alleged nor introduced evidence suggesting impossibility or frustration of the trust’s purposes . . . —is, accordingly, barred under principles of issue preclusion by virtue of the Land Court judge’s order [in Murphy v. Kelley].” Steele at 729. Nothing new on this subject was presented by Steele at the second trial.
As noted in Steele at footnote 19, the “ ‘decision [to terminate a trust depends upon] whether the purposes of the trust have been achieved. [It] is a judicial matter. The courts alone can make that decision.’ Franklin Foundation v. Attorney Gen., 340 Mass. at 205.”
The CCT was established to own real estate and lease premises on which a restaurant and bar were operated. The restaurant/bar was to be run by and employ members of the Kelley family, among others. It has done that from the day of its inception, and it is still doing so today. There has been no proof of either a frustration or impossibility of purpose with respect to the CCT.
Additionally, under the language of the CCT, only the trustee is given the discretionary power to decide whether to terminate the trust. Kelley has not been shown to have abused his broad discretion in not terminating the trust.
The CCT has given exceptionally broad powers to the trustee. “(E]ven very broad discretionary powers are to be exercised in accordance with fiduciary standards and with reasonable regard for usual fiduciary principles . . . Accordingly, [the SJC] has upheld trusts which have invested a trustee with broad discretionary powers where some recognizable standard is provided for the exercise of the trustee’s discretion.” Ventura v. Ventura, 407 Mass. 724, 728 (1990).
The Appeals Court instructs that “the fact finder must consider the ‘whole instrument . . . due weight being given to all its language, with some meaning being given, if possible to all parts, expressions, and words used, discarding and disregarding no parts as meaningless, if any meaning can be given them, consistently with the rest of the instrument.’ ” Steel at 733. This Court has done as instructed and rules that the purposes of the CCT can be, and are still being, accomplished. Thus, Steele as a beneficiary cannot compel its termination.
Count III must be DISMISSED.
Count IV — Termination of the Lease with the K’s Inc.
Steele challenges the lease entered into by Kelley as trustee of the CCT with the corporation controlled by his daughters, The K’s, Inc. Steele claims the lease was, to quote him, “a sweetheart deal.” No evidence was presented, however, to justify this accusation.
The lease was executed by Kelley at a time of some distress for the CCT. The trust had just survived the ten-year fight for its life with the Murphy family. Its principal tenant, the SSSC, walked out on its lease of the restaurant/bar property, owing $40,000 to $50,000 in back rent and having stripped the premises of all of its fixtures — right down to the bar, the sinks and the toilets — leaving the place a physical shambles. A smaller tenant, which also sold food, required the use of the restaurant/bar’s plumbing and toilet facilities for its employees. It was not an easy task for Kelley to find a substitute for the SSSC, even though finding his daughters may seem at first blush to have been the result of something less than an aggressive search.
What is important is whether the lease itself was a proper economic investment for the CCT. It was, for a number of unchallenged reasons.
To start with, the tenant, The K’s, Inc., was consistent in all respects with the CCT’s purpose. It leased the premises to operate a restaurant and bar and employ members of the Kelley family. Furthermore, The K’s, Inc. was willing to accept the inconvenience of the use of its plumbing and toilet facilities by the neighboring lessee. Additionally, The K’s, Inc. invested close to $150,000 in rehabilitating the premises to make it operable as a restaurant/bar and agreed in the lease that those renovations would become the property of the trust upon its lease’s termination.
Most significantly, however, is the fact that the rent for the lease with The K’s, Inc. is above fair rental value and has been approved by the court. The receiver installed in April of 1996 by the court at the conclusion of the first trial of this case engaged in September of 1996 an independent real estate appraiser who examined the lease with The K’s, Inc. and found it to call for a monthly rental above the fair market rental value for the premises. This finding was presented by the receiver to the court, with notice to all interested parties, *632 including the beneficiaries, and was approved by the court, without objection.
The Appeals Court noted that in the first trial “Steele presented no evidence whatsoever as to fair market rentals of similarly situated properties as of the spring of 1993 and admitted that he had consulted no one with experience in the matter prior to alleging that the rental was below market. Steel also introduced no evidence that the K’s was a sham or straw corporation or otherwise had acted merely as Kelley’s agent in operating the restaurant and bar on the premises.” Steele at 738. Nothing more was presented at the retrial.
Steele’s case for termination of the lease rests wholly upon an unfounded suspicion that because Kelley’s daughters were involved, it must have been a sweetheart deal. It is not. Further, there was no evidence presented that any damage to the trust resulted from The K’s, Inc. lease. “If no damage resulted to the CCT from the K’s lease, whatever Kelley’s purported motives or misconduct may have been, there was no basis for terminating that lease.” Steele at 741. Count IV must be DISMISSED.
Count VT — Removal of Kelley as the Trustee
This count asks for the removal of Kelley as trustee of the CCT. Steele points to the evidence of Kelley’s breaches of his duties of loyalty to the beneficiaries in the management of the trust — mostly in his favoring himself over the beneficiaries noted above, his failure to provide accountings, and his failure to pay real estate taxes and other obligations at a time that he was making payments to himself — and to the immense hostility that now exists between Kelley and the beneficiaries as grounds for his removal.
“The fundamental question on the issue of trustee removal... is not the wishes of the beneficiaries, but rather ‘whether the circumstances are such that the continuance of the trustee in office would be detrimental to the trust.’ 2 Scott, Trusts sec. 107, at 104 (emphasis added) & 107.3, at 124-25.” Steele at 742.
The mere existence of hostility between beneficiaries and a trustee does not necessarily require removal of the trustee. Shirk v. Walker, 298 Mass. 251, 260 (1937). Symmons v. O’Keefe, 419 Mass. at 295, Hardiman v. Hardiman, 11 Mass.App.Ct. 626, 629 (1981). “There are many trusts in which no trustee could fully perform his duty without incurring the hostility of some of the beneficiaries.” Shirk v. Walker, supra. Edinburg v. Cavers, 22 Mass.App.Ct. at 227. Nevertheless, hostility can be a ground for removal, even where the trustee is without fault. Shirk v. Walker, supra. The question of removal is addressed to the discretion and sound judgment of the judge. Cooney v. Montana, 347 Mass. 29, 38 (1964). Hardiman v. Hardiman, supra.
Shear v. Gabovitch, at 688.
In this case the fact of hostility is blatant. It was not shown to have been caused by Kelley alone, however. Rather, it was the Murphy litigation and what led up to it in the early 1980s that seem to have gotten it all started. No explanation was tendered by anyone as to what caused the initial split between Kelley and his one-time friend and fellow lawyer Patrick Murphy. Clearly, however, the bitter ten years of litigation, mostly targeted at Kelley, served to enhance immensely the negative feelings of all parties involved.
Then, when Kelley in 1992 was freed at last of the yoke of the Murphys’ claims, his instant response in the management of the trust was wholly self-centered in reimbursing himself, securing his position with the mortgage and assignment of the leases and rents, and signing up the lease with The K’s, Inc., all without consulting with the beneficiaries, even if he did not technically need their approval, and only tended to heighten the enmity.
The situation was further inflamed by Kelley’s refusal, or at least lack of diligence, in providing ac-countings when demanded by the beneficiaries and his “discretionary” exercise not to make distributions, while repaying himself.
The next five years of litigation — this time instituted by Steele, complete with Steele’s initial victory and Kelley’s success in overturning that victory at the Appeals Court level — have still further exaggerated the depth of negative feelings.
It is appropriate to remove a trustee when hostile feelings threaten to interfere with the administration of the trust. See Comstock v. Bowles, 295 Mass. 250, 259-60 (1936); Shirk v. Walker, supra; Symmons v. O’Keefe, 419 Mass. at 295; Edinburg v. Cavers, supra . . . “(W)here the duty of a trustee is so delicate, where the hostility has arisen since the trust was created, and is attributable in part to the fault of the trustee, where the existence of the hostility would naturally pervert his feelings and judgment, it is competent for a justice to remove a trustee without further proof of misconduct, upon the ground that the removal appears essential to the interests of the beneficiary.” That is the situation here. A trustee with almost plenary discretion over all distributions to a beneficiary cannot reasonably be expected to exercise his power with desirable perspective and detachment when his motives and integrity are constantly impugned by the beneficiary and the parties have been mired for years in a draining legal equivalent of total war. Prudence called for a change of trustees.
Shear v. Gabovitch at 689.
The words quoted above could as well have been written for this case. While the genesis of the hostility here may be lost in the mists of time, the fact of its existence today could not be more clear. Layered as it is on a trust instrument that grants such plenary discretion to a trustee in connection with all his *633 activities as a fiduciary, particularly the very critical aspect of distributions to beneficiaries, with a trustee who has demonstrated a ready tendency to take care of himself first, and coming off nearly twenty years of contentious, expensive and accusatory litigation, all aimed at the trustee and his activities, prudence calls for a change of trustee of the CCT. Kelley has not been well treated by the beneficiaries of the trust, but he has shown himself to be all too ready to respond in kind. The circumstances here are such that the continuation of Kelley in the position of trustee of the CCT, given the exceptionally broad powers provided therein and his near total control of the distributions therefrom, would be detrimental to the trust.
Fortunately, the CCT instrument provides for succession in the office of trustee. By Declaration of Amendment dated September 30, 1980, duly executed and recorded, the original CCT was amended “by appointing in place of Paul M. Murphy, of Brookline, Massachusetts, Mr. Thomas M. Finneran, [then] of 56 Pleasant Hill Avenue, Dorchester, Massachusetts,” as successor trustee thereof. Mr. Finneran is an attorney, by marriage a member of the Kelley family, fully knowledgeable about the CCT and the restaurant/bar business of The K’s, Inc., and a man of high reputation in the community. The trust and its beneficiaries ought to be well served by his stewardship.
ORDER FOR JUDGMENT
For the several reasons set forth herein, the Court orders the entry of judgment: dismissing Counts I, in and IV in their entirety; dismissing Count n, except insofar as the new trustee of the Chatham’s Comer Tmst is ordered, within thirty days from the date hereof, to reform and record the mortgage of March 30, 1993 and any promissory note secured thereby in a manner consistent herewith, recover of Gerald F. Kelley any amount in excess of $189,549 that he has paid himself from the trust, and discharge the assignment of leases and rents; and granting the prayers of Count VI removing Gerald F. Kelley as trustee of the Chatham’s Comer Trust and substituting in his place as successor trustee Thomas M. Finneran of 7 Countryside Drive, Mattapan.
It is further ORDERED that upon the succession of Mr. Finneran as trustee of the Chatham’s Corner Trust, the present receiver thereof, William F. Looney, Jr., be directed to prepare and file a final accounting and take such other steps as may be required to wind up his receivership, which is hereby terminated, in the most expeditious manner.[15]

 This Court was sworn in on October 8, 1996, after the plaintiff, Walter Steele, retired from the Superior Court. There is, therefore, no basis for recusal.

 The dismissal of Kelley’s counterclaim for abuse of process was not appealed to the Appeals Court. See Steele at 717, n.8, 744.

 “By late February 1979, Patrick, or someone in his office other than Kelley, had drawn up the Chatham’s Corner Trust including the schedule of beneficiaries.” Findings of Fact No. 26 in Murphy v. Kelley, Suffolk Superior Court #56546; Exhibit 26 in this retrial.

 This tmst is referred to hereafter as the CWEN tmst.

 The “Murphy" is another of Patrick Murphy’s brothers, Thomas; and “Kelley” is the same Kelley who is defendant here. The CCT and the CWEN trust, and the property that is the res of the CCT, were all at issue in Murphy v. Kelley. Somewhat like the Easter Uprising, or perhaps the Battle of the Boyne, Murphy v. Kelley presaged the current troubles between and among Kelley, the Murphys, Steele, and the Meskells.

 See p. 3 herein and n.8.

 Many of the issues were bifurcated and never tried. Essentially, the only issues that went to judgment were the ruling that title to the site was properly in the CCT; Kelley was its tmstee; and a declaration as to the beneficial interests then, and now, in the CCT.

 Consistent with Steele at 726, this Court has already dismissed Count V seeking relief pursuant to G.L.c. 93A.

 Any failure to provide in some document — partnership agreement, joint venture agreement, contract, or otherwise— for reimbursement for the original venturers must he at the feet of the “three lawyers and a judge” who launched the project with the shake of a hand or less. It cannot be cured by an invasion of a trust that makes no provision therefor.

 $189,549.

 Steele seems to have acknowledged this fact in his deposition testimony, accepted in evidence in this retrial, when he responded as follows:
Q And did you file, do you know, any proceeding in that Murphy-Kelley case claiming or asserting that the Chatham’s Corner Trust was invalid?
AI don’t believe I did. When you say invalid, void?
Q Invalid, void, or otherwise?
A No, no. I never did that.
Q And you don’t claim that today; do you?
A No, sir.
Q Now did you ever claim in the Murphy-Kelley case?
AI don’t claim that it is invalid. The answer is no.
Q Do you claim in the Murphy-Kelley case or make a claim in the Murphy-Kelley case, that the trust was executed as a result of either fraud, duress, or undue influence?
A No, because it was not. We all understood. The only thing I would criticize is the broad terms, but that’s it. And I have never asserted it was fraudulent or invalid or anything of that nature.
Q And you don’t assert that today?
A No, sir. I do not.

 Hereafter, all pleadings and other filings in THIS CASE SHALL BE MADE, ONCE AGAIN, AT THE OFFICE OF THE CIVIL CLERK, SUFFOLK SUPERIOR COURT, NOW AT 90 DEVONSHIRE STREET, BOSTON, MA 02109.